## J. I. RUSSELL, *et al.*, v. THE STATE, *ex rel.* WILLIAM NICHOLSON.

1. ELECTIONS; *Conduct of; Irregularity.* A mere irregularity in conducting an election, which does not deprive a legal voter of his vote, or admit a disqualified voter to vote, or cast uncertainty on the result, and has not been occasioned by the agency of a party seeking to derive a benefit from it, should be overlooked in a proceeding to try the right to an office depending on such election.

2. POLL-BOOKS; *Prima Facie Evidence.* The poll-books are *prima facie* evidence of the number of votes cast, and of the result of the election.

3. FRAUD OF ELECTION BOARD; *When Vitiates Election.* When the judges and clerks of an election intersperse fictitious names in the lists of voters on the poll-books, and deposit spurious ballots in the ballot-box, and this is proved and admitted as to nearly one-fourth of the names on the books and ballots in the box, and there is no testimony *aliunde* showing that the other names are the names of real persons, and the other ballots cast by legal voters, it is not error to reject the whole poll-book as no longer even *prima facie* evidence.

### *Error from Wilson District Court.*

MANDAMUS, to require Russell as clerk of the district court, and J. C. G. Smith as county clerk of said county, to remove their offices from the town of Fredonia to the town of Neodesha. On the 23d of May, 1871, an election was held in Wilson county for the relocation of the county-seat. The board of county commissioners canvassed the votes on the Saturday following the election, and from such canvass and the poll-books returned to the county clerk, it appeared that Fredonia received 1168 votes, and Neodesha 938 votes and said board determined and proclaimed Fredonia to be the county-seat. The poll-books returned from the precinct of Fredonia showed that 546 votes were cast at that precinct, all for Fredonia, and these 546 votes were canvassed and are included in said 1168, above stated. *Nicholson,* the relator, an elector and tax-payer of the town of Neodesha, commenced this action in the district court on the 22d of June, 1871, alleging that the election held in the precinct of Fredonia

was fraudulent and void; that the poll-books returned therefrom were false and fraudulent; that said 546 votes canvassed as having been cast for Fredonia ought not to be allowed, and that Neodesha had in fact received a majority of the legal votes cast in said county at said county-seat election, and was the legal county-seat of Wilson county. An alternative writ was allowed. The respondents showed cause, denying all fraud in the election, and alleging that Fredonia was the county-seat, and they rightfully kept and held their offices at such town. The case was tried at the July Term 1872 of the district court. The court made findings of fact and law, separately. Among the facts found are these:

"5th. That at each of the voting precincts of said county said election was regularly and fairly conducted, save and except at the precinct of Fredonia, in the township of Center.

"6th. That the persons acting as judges in said Fredonia precinct were S. R. Furguson, Wm. Eshert, and J. O. Vassar, and the persons acting as clerks in said precinct were S. A. Hamburger and Lewis Kehn.

"7th. That said S. R. Furguson was not sworn as a judge of said election, and no oath or affirmation was administered to either of the other members of the board save and except an oath administered by said S. R. Furguson. * * *

"9th. That said last-named election was held in a small one-story building; that the window at which the votes were received was boarded up to the top of the lower sash, while the upper sash was entirely removed, and the votes were received through the opening so made by the removal of said upper sash; that one of the judges, Furguson, stood up by the window in the inside of the room and received the votes and called out the names of the voters as the votes were handed in at the window; that persons standing on the ground, outside the building, and in front of the window, could not plainly see all of the judges and clerks in the room.

"10th. That the election board refused admission during the time of receiving votes to R. S. Futhey and M. V. Yoder, friends of Neodesha, who were sent to said town of Fredonia by citizens of Neodesha to witness the manner of conducting the election in said Fredonia precinct, and to challenge

votes; that said board also refused admission into the room (when the votes were being received) to the friends of Fredonia.   *   *   *

"14th. That said election board of Fredonia precinct was selected on the evening before said election by a meeting of eight or ten persons, friends of Fredonia.   *   *   *

"16th. That 127 names appear upon the poll-books written in different ink from the remaining names which appear thereon; and the court finds, (respondents admitting the same,) that 127 fictitious names were placed upon said poll-book by said S. A. Hamburger, one of the clerks of said election, and a corresponding number of ballots for Fredonia placed in the ballot-box by said Hamburger, and that said names were so written, and said ballots put in the ballot-box, before the voting of said precinct commenced.

"17th. That one Charles Sweeny was selected the night before said election by a meeting of a few citizens of the town of Fredonia to take charge of the interests of Fredonia in the election; that the persons constituting the election board were assembled at Sweeny's office, and organized as a board, at or about the hour of 8 A. M., and that said office was not the place at which the election in said precinct was held."   *   *   *

Among the conclusions of law found by the district court were the following:

"1st. The persons acting as judges and clerks of the election in Fredonia precinct, although not sworn, were officers *de facto,* and a failure on their part to properly qualify does not necessarily invalidate the election and thus defeat the will of the people.

"2d. The statutes providing that the respective candidates not exceeding three in number shall be admitted to the room where the judges are during the time of receiving and counting the votes, is directory merely; and the exclusion of Futhey and Yoder, friends of Neodesha, from the room where the voting took place at said election will not invalidate the election in said precinct.

"3d. The *prima facie* character of fairness which attends poll-books of an election, and the presumption that they speak the truth, and show the actual number of *legal* voters and *those only* who vote at an election, is founded in the first instance upon the presumption that the officers of election act in observance of the requirements of law, and upon honest and conscientious convictions of duty. And where it *mani-*

*festly appears* that they only have the inclination and opportunity for the commission of fraud, the full extent of which, if committed, could not by any means be ascertained, but in addition actually set about carrying it out, and show a reckless, wanton and criminal intent to defeat the honest expression of the popular will, the *prima facie* character which ordinarily attaches to their acts is destroyed, and the burden of proof is thereby shifted upon those who are expected to be benefited by such fraudulent acts to show that they did not in fact *defeat* the real will of the people.

"4th. It being admitted that one of the clerks, Hamburger, fraudulently placed 127 fictitious names upon the poll-books, and put into the ballot-box 127 ballots corresponding thereto in favor of the town of Fredonia, *before the voting began*, the other clerk, Kehn, must have been cognizant of the attempted fraud; and as nothing appears to show that he communicated the facts to any other person it must be inferred that his designs were as unlawful as those of Hamburger; and when through the agency of the two clerks a fraud of this magnitude is clearly shown, no presumption in favor of the remaining portion of the poll-book being genuine can reasonably obtain, * * * and no votes in said election in said Fredonia precinct should be counted save those which are shown by evidence to have been legally cast. * * *

"6th. That the pretended election held in the precinct of Fredonia in the township of Center in said Wilson county is void, and should be set aside. And a majority of the legal votes cast in the remaining precincts being in favor of Neodesha, the said last-named place is in law the county-seat of said Wilson county."

Other facts are stated in the opinion of the court. New trial refused; peremptory mandamus awarded; and the respondents, *Russell* and *Smith*, bring the case here for review.

*T. J. Hudson*, and *Martin, Burns & Case*, for plaintiffs in error :

1. The court erred in admitting improper evidence, to-wit, the mere opinions of witnesses, and hearsay-statements of irresponsible persons, not parties to the action. · The record shows a continuous and persistent effort on the part of the relator to bring to the knowledge of the court the actions and doings of an irresponsible body of men, who were acting

under the influence of political excitement and whisky; and we are led to conclude from the findings that the court gave countenance and consideration to such incompetent evidence. If the court did not give any credit or importance to this class of evidence, why was it permitted to be introduced over the objections made?

2. The *third* conclusion of law, as found by the court is, we think, erroneous. It is true, some portions of it no doubt are good law, but on the other hand we think it equally true that other portions are not good law. But in any event, it can only be considered as an abstract proposition of law, not warranted by any facts found in this case.

3. There is error in the *fourth* and *sixth* findings or conclusions of law, and (with the exception of the admission of improper evidence) we consider the main questions of law in this case are presented in these two findings, either of which, if erroneous, must reverse the judgment.

We take it for granted that this action or proceeding was brought under, and in pursuance of the provisions of ch. 79, laws of 1871, entitled "An act providing for contesting county-seat elections," approved March 3, 1871. Section 7 of said act provides that in a contest of this kind "the validity of any vote or votes cast or counted, or offered and refused, at such election, which vote or votes shall be designated in the petition or answer, shall also be determined, and every illegal vote so cast or counted, shall be rejected by the court." The question then to be determined by the court in all election contests under this law is, which party or place received the greatest number of legal votes. The court finds as a fact, that the poll-books and tally-lists of the various precincts in said county, show that Fredonia received 1168 votes, and Neodesha received 938 votes. The court further finds as a fact, that at each of the voting precincts of said county, said election was regularly and fairly conducted, except at the precinct of Fredonia; that the total number of votes cast at Fredonia precinct, as appears from the poll-books and tally-lists, amount to 546, all of which were in

favor of the town of Fredonia for county-seat; and also, that 127 fictitious names were placed upon the poll-book of Fredonia precinct, and a corresponding number of ballots for Fredonia were placed in the ballot-box before the voting commenced. There is no evidence appearing in the record, or any finding of the court, that any other fictitious or fraudulent votes were cast or counted at said election, except the 127 votes counted in Fredonia precinct. So far then, as the facts appear in this case, taking it for granted that the poll-books and tally-sheets were *prima facie* correct, the illegal votes should have been rejected by the court, and whichever place had a majority of the residue of the votes should have been declared the county-seat. This would have given Fredonia 103 majority. But the court erroneously, as we claim, came to the conclusion that the *whole vote* of Fredonia precinct was void, and could not be counted, save those which are shown by evidence, other than the poll-books and tally-sheets, to have been legally cast, basing this conclusion on the fact that 127 fictitious ballots had been counted in favor of Fredonia, by the fraudulent acts of the clerks of the election. On this point we claim: 1st.–That the receiving and counting of illegal votes does not necessarily vitiate the proceedings. If the judges or clerks acted corruptly they should be prosecuted: 21 Pick., 153. 2d.–It is no objection to an election that illegal votes were received, unless the illegal votes changed the majority. The mere fact of their existence never avoids an election: 2 Cush., 39; 8 Gray, 140; 19 Wend., 635; 7 Cow., 153. 3d.–If the judges and clerks of the election fraudulently received and counted votes, this is not enough to render the election void. The fraudulent votes should be deducted from the number returned for whom they were counted: 1 Brewster, 11; Leading Cases on Election, 251 to 257, and 351 to 359; 65 Penn. St., 40 to 51; 19 Ohio St., 207; 20 Wend., 12. 4th.–The respondents were not bound to show by evidence that the votes cast for Fredonia were legally cast. The relator took upon himself the obligation of showing that Neodesha received a majority

21—11 KAS.

of the legal votes cast at said election, and the simple fact that 127 fraudulent votes were cast and counted in favor of Fredonia did not change the *onus* of proof. The burden of proof is always upon the persons contesting the election. It must be made to appear affirmatively that the place, whose election is contested, received a number of *illegal* votes, which if rejected would have reduced it to a minority: 21 Pick., 154; 7 Cow., 153.

The question to be decided in an election contest is not whether there were frauds committed by the election officers, or who was guilty of a fraud, but which party or place received the greatest number of legal votes. The poll-books, tally-sheets, and other election papers pertaining to such election are to be considered as *prima facie* true and correct. 16 Ohio St., 184; 20 Wend., 12. The poll-books, tally-sheets, etc., appeared regular on their face, and showed that Fredonia received a majority of the legal votes, and was by the board of county canvassers declared the legal county-seat. The relator, for the purpose of maintaining his action and sustaining the allegations in the writ, was permitted to go behind the poll-books and tally-sheets, as he had a right to do, and introduce parol evidence for the purpose of impeaching the *prima facie* correctness of the result of the canvass by the county board. The testimony thus introduced by the relator, tended in some respects to show irregularities on the part of the judges and clerks of the election at Fredonia precinct, but nothing that affected in the least the result of the election, with the exception that it was admitted, on the part of the respondents, that the clerks of the election at Fredonia had fraudulently entered upon the poll-books fictitious names to the number of 127, and put a corresponding number of ballots in the ballot-box, all of which ballots were for the town of Fredonia. This was all the evidence tending to impeach the poll-books and tally-sheets of the election, or to reduce the number of votes cast for Fredonia. Now we claim that this proof did not sustain the allegations in the petition, for the reason that the illegal votes so proven

were not sufficient to change the result of the election. The relator set out and designated in the complaint, as he was bound to do, the names of alleged illegal voters, sufficient to have changed the result; but we insist that there was no proof offered in the case ten ding to show a single illegal vote cast at Fredonia, or at said election, except the 127 votes, nor did the court determine or pass upon the residue of the votes alleged to be illegal as required by law. Laws of 1871, §7, p. 193.

We entertain no doubt t hat there are causes for which the court ought to reject the entire vote of an election precinct. But in no case should this be done if the canvassing court can separate the legal from the ill egal votes, and reject the illegal ones. Mere irregularities in the manner of conducting an election, or fraud on the part of the officers, will not vitiate an election, unless it be of so gross a character as to destroy all means of ascertaining the true result. 8 N. Y., 68; 19 Ohio St., 204; 20 Wend., 12. The limit of this power of the court to reject the polls of an entire precinct is properly stated by Chief Justice Thompson, in 65 Penn. St., 40 to 51, in which we find this language: "I maintain that there is nothing which will justify the striki n g out of an entire division, but an inability to decipher the returns, or by showing that not a single legal vote was polled, or that no election was legally held." It is true that the opinion of Justice Thompson just cited, is a dissenting opinion from a majority of the court on a different branch of the case; notwithstanding, we consider it good authority on the point in this case. And afterward the supreme court of the state of Pennsylvania reiterated and adopted the same rule. The court in treating on this subject of striking out entire precinct s, say: "This ought never to be done where a legal election as to time and place is held, although *fraudulent votes shall h ave been* received. The remedy in such a case is to purge the polls by striking out the fraud-ulent votes if possible." 68 Penn. St., 336. In all the cases that we have been able to find where the entire poll has been rejected by the court, it has only occurred where there was no

legal election held, or that the conduct of the officers rendered it impossible to ascertain the true result. And see 16 Ohio St., 184.

*R. M. Ruggles,* and *T. H. Knapp,* for defendant in error:

1. The acts and doings and declarations of the partisans of Fredonia before the election, was competent as part of the conspiracy to perpetrate a fraud at Fredonia precinct. 1 Greenl. Ev., §§ 111, 112. What was said and done at the time of the election and canvass of the votes was competent as part of the *res gestœ:* 1 Greenl. Ev., § 108. The admissions of a party to a record of one *identified in interest* with him are admissible in evidence: 1 Greenl. Ev., § 171. The evidence showed as clearly as anything could be shown, that Furguson was among the most active and energetic of the partisans of Fredonia for the county-seat, and therefore as much a party in interest as any citizen of Fredonia could be. He voted for that place for county-seat, was active before the election. We are well aware this court intimated in the Osage county-seat case (9 Kas., 569,) that the declarations of one not a party to the record were inadmissible; but it seems to us that such statement was inaccurate. By the statute under which that case arose, (Laws of 1869, ch. 27, p. 101,) any elector could commence the contest, and any other elector could come in and resist, and each would then represent rival towns. According to above ruling in the Osage county-seat case the declarations of either of such parties would be competent, but no other person's declarations would be. This looks to us as though it could not be the law. The statute under which the present case arose, (Laws of 1871, ch. 79, p. 190,) allowed any elector to commence by mandamus or injunction, and some person in office would of necessity be the defendant, simply because he was holding the office, and not because of any interest he had in the event of the action. Now, it seems to us absurd to say that the admissions of a *defendant* under such circumstances would be admissible, but the declarations of the most fierce and bitter partisan of the town would not.

"The letter killeth but the spirit giveth life." The reason of the rule being that the admissions or declarations are against the interest of the party making them, and therefore probably true, it would embrace such a case as the present. The declarations of a voter as to his qualifications, or want of qualification, is admissible; (27 N. Y., 59;) and this upon the theory that he is a party in interest. It is competent to show what a judge of election stated the morning after election: Leading Cases on Elections, 415.

The defendant below was only the nominal defendant. The citizens, or rather partisans, of the town of Fredonia were the real defendants, and the declarations of any one interested in the result in favor of the town of Fredonia was competent to be introduced, and more especially one who was a member of the pretended election board. But it will be seen from the findings that the court below did not take into consideration the statements, the admission of which is assigned for error, so no injury was sustained by the plaintiff in error.

2. Were the findings sustained by the evidence? The findings have the same effect that a special verdict of a jury would have: 9 Wallace, 127. This court has repeatedly decided that it will not interfere if there was some evidence to sustain the verdict: *A. T. & Santa Fe Rld. Co. v. Blackshire,* 10 Kas., 477. As we understand the law, when it is shown that there is doubt or uncertainty whether the poll-books and tally-sheets correctly and fairly show the result of an election, then it becomes the duty of the court to cast out the entire polls of that precinct: 8 N. Y., 93; and dissenting opinion in same case, p. 105; 20 Pick., 492; 16 Mich., 306; 19 Ohio St., 27; 15 Ohio St., 144; Cooley's Const. Lim., 617; 6 Kas., 538; 41 Penn. St., 401.

It was agreed by the active friends and agents of Fredonia on the night preceding the election that Furguson, Short and Vassar should be the judges of election on the following day at Fredonia precinct, and neither of them was a justice of the peace, or township trustee. The poll-books were a fraud,

and prepared before the election, though to what extent or what number of names were placed thereon we cannot tell. The plaintiffs in error by their counsel admit that 127 names were placed there *fraudulently* before the voting commenced. This would of itself be sufficient to cast out the elective vote of the precinct. McMahon and Marshman show in their testimony that fictitious names were written on the evening preceding the election to be used in Fredonia precinct, though to what precise extent is not shown. The evidence shows that the window was boarded up so that no one could see from the outside what was being done inside the room where the polls were held. The evidence further shows that in violation of an express agreement before made with the people of Neodesha the election board refused to permit any friend of that place to be present in the room where the polls were held, and this also in violation of an express statute. The evidence further shows that the ballot-box was in charge of Ferguson, (who, nobody, not even himself, claims was sworn,) for an hour or more at dinner, but not in his view all the time, but in the next room on a bureau a portion of the time. The evidence further shows that the ballot-box was in the *sole* custody of this same unsworn and foresworn Ferguson for the space of an hour-and-a-half to two hours, between the time of closing the polls and the time of counting the ballots, and during this time being carried around by this same Furguson, but *where*, neither he nor any one else tells us, and of which we absolutely know nothing until it turns up in Hudson's office, about a quarter of a mile from where the polls were held, except that Ferguson tells Armstrong that during that time there were enough spurious ballots introduced into the ballot-box to cover the 127 fictitious names (admitted by plaintiff in error) placed on the poll-books *before* the polls were opened, and also enough spurious ballots to cover the 127 fictitious names placed on the poll-books *after* the voting closed. Clearly testimony showing these facts, even though it be the declarations of members of the election board, and active partisans of Fre-

donia, though not parties to the record, is competent, and was properly admitted.

There is a noticeable fact connected with the evidence. It shows that from a careful canvass made a short time before the election by the ·friends of Fredonia that there were 275 legal voters in the township. To these 275 *legal* votes, add, Marshman's and Fickel's votes, illegal, 2; and the number placed on poll-books *before* polls were opened, as admitted by plaintiff in error, 127; and the number placed on poll-books *after* voting had ceased, as stated by Ferguson to Armstrong, 137; making a total of 541—being within *five* of the number of names (546) on the poll-books of Fredonia precinct, actual and fictitious! If all the things we have enumerated are not sufficient to sustain the findings of the court, and to cast "doubt and uncertainty on the result," as shown by the poll-books, then we are at a loss to know what would.

3. The *prima facie* character which the law attaches to the returns of an election, as to the number of votes cast, for whom or what cast, and that the persons actually voted them, and that the persons casting such votes were at the time such votes were cast legal electors of the township, depends upon the presumption of law that the members of the election board have faithfully and honestly done or endeavored to do their duty. The moment that this presumption is destroyed, then it devolves upon a party claiming under an election to show that it was in all respects conducted fairly; that the persons purporting to have voted actually did vote, for whom or what each voted, and that each person so voting was a legal elector of the township. In other words, it changes the burden of proof, and requires a party claiming under an election to purge the poll. That could only be done by taking each individual vote, and proving by competent testimony that it was a legal vote; and such as would be shown to be legal votes should be counted and the rest rejected. The plaintiff in error did not do this; hence the entire poll must be rejected. When an election board is shown to have acted willfully and corruptly wrong, to have perpetrated an

*actual fraud*, as has been shown in this case, it must avoid the entire poll (unless the votes are proved one by one to have been legal votes) in the precinct at which it is shown to have been perpetrated. It cannot be otherwise. The elective franchise, else, is a contemptible mockery, and no elector, when he deposits his ballot can feel certain that the result as declared by the judges will correctly and fairly express the popular will.

The opinion of the court was delivered by

BREWER, J.: This is a contest over a county-seat election. The contest arose in the county of Wilson. The county commissioners, canvassing the returns, declared the majority to be in favor of Fredonia. Upon this contest the district court decided in favor of Neodesha. To reverse that decision this proceeding in error has been instituted. The main question is concerning the vote of Fredonia precinct. With that counted, Fredonia received 230 majority. With that rejected, Neodesha had 316 majority. The poll-books of that precinct showed 546 votes, all for Fredonia. The election was conducted in a small room, with only one window in front, and that boarded up to the upper sash. The judges refused admittance to any friends of Neodesha during the time the votes were received. The polls were closed at noon, and the ballot-box carried away by two of the judges. An attempted challenge was met by threats of violence. After the closing of the polls the ballot-box was removed to another place, and the votes counted there. There was evidence showing that one of the judges and one of the clerks prepared the poll-books the night before the election, and wrote in the list of voters a large number of fictitious names. The original poll-books are brought up with the record, and it is evident at a moment's glance that the names were not all written at the same time. They appear in different colored ink and handwriting, and those of like ink and handwriting not together. They alternate, as it were, now one of one color, the next of a different, the third like the first, and so on. And finally,

it was admitted that 127 of these fictitious names were so written on the poll-books, and 127 spurious ballots deposited in the ballot-box prior to the opening of the polls. The district court held, from this proved and admitted fraud, that that *prima facie* character which attaches to the poll-books as evidence of the results of an election, and the number of votes cast, was lost and destroyed, and, there being no evidence *aliunde*, that there was no proof of any votes having been cast in that precinct. Was this error? It has been well said, "that any irregularity in conducting an election which does not deprive a legal voter of his vote, or admit a disqualified voter to vote, or cast uncertainty on the result, and has not been occasioned by the agency of a party seeking to derive a benefit from it, should be overlooked in a proceeding to try the right to an office depending on such election." Cooley's Const. Lim., 618, and cases cited in note. We have followed that rule in this state: *Gilleland v. Schuyler*, 9 Kas., 569; *Morris v. Vanlaningham*, supra, 269. The misconduct of the officer should not deprive the legal elector of his vote, nor the candidate of the benefit of that vote. He alone should suffer the penalty of his own misconduct, and be punished in a direct proceeding therefor. With the rule thus enunciated, and so well supported upon both principle and authority, we are entirely content, and see no reason to change or limit its force. But does the decision of the district court conflict with this rule? We think not. The poll-books do not constitute the election. They are simply evidence of what was done, and but *prima facie* at that. You can always in a contest go back of them and inquire into the facts. They are evidence, because they are the records of official acts, made by certain officers of the law, who are presumed to have followed the law, and honestly discharged their duties under it. The possibility of error and mistake attaches to all official acts and records, yet such possibility does not destroy the value of the records as evidence of the facts. Probably also the existence of error and mistake, if it resulted from accident or inadvertence, would not affect the credibility of the record

outside of such error and mistake.   But when it appears that
the record was manufactured in fraud, and the evidence a lie,
what rights can be established by it?   .The records of a court
import absolute verity, and the parties to a suit are concluded
by its judgment.   Yet if it be shown that judge and clerk
have fraudulently combined and entered up a false judgment,
its rottenness destroys it altogether.   It concludes nobody.
No rights can rest upon it.   Here the record purports to
show that 546 voters recorded their choice of Fredonia as
the county-seat.   Outside of that record there is no evidence
except the general statements of witnesses, that an election
was held that day, and that votes were received at such a
place.   No testimony showing how many votes were cast, or
that those voting were legal voters.   The case rests upon the
records of the poll-books.   Now comes the contestant and
says that the record is a lie, and proves that 127 of the
names so recorded as the names of legal voters are fictitious,
and that 127 spurious ballots were cast into the ballot-box.
In other words, he proves absolutely that nearly one-fourth
of this record is false.   And this falsehood cannot have been
the result of ignorance or mistake.   It is not possible that
this could have happened without the knowledge, consent,
and connivance of both the clerks, and some at least if not
all of the judges.   Surely, there was criminal culpability if
not actual, intentional wrongdoing on the part of all the
officers of that election board.   But, says the contestee, the
whole record is not shown to be false.   Reject the 127 votes
proved to have been spurious, and accept the balance not thus
proven.   In other words, accept all of the record not proved
untrue.   If the falsehood resulted from mere mistake there
would be great force in this demand.   So also if the falsehood
resulted from the fraud or wrongdoing of others than the
board.   But where the recording officers are proved to have
knowingly made a largely false and fraudulent record, how
can we place reliance on any of the record?   *Falsus in uno,
falsus in omnibus.*   Does the written testimony of a witness
stand any higher than the oral?   If these five election officers

were on the witness stand and testified that 546 legal voters cast their votes on that day for Fredonia and it should afterward appear that they knowingly and willfully testified falsely in reference to ·127 of those votes, and the number of votes was material, would not the district court have been compelled to reject their entire testimony? *Campbell v. The State*, 3 Kas., 488. Yet this was all that was done in this case. It doubtless happens that some legal voters are by · this decision deprived of the benefit of their votes. Perhaps there were honest votes cast, enough to have given the majority to Fredonia. A large majority of the citizens of Fredonia are honest men, were ignorant of the fraud which was being perpetrated, and are doubtless as much grieved as we at this terrible trespass on the purity of the ballot-box. May this example preach its lesson, not alone to them, but equally to every citizen of the state. They who in Rome watched and kept the sacred fire were vestal virgins. Equally pure should they be who watch and guard that which is far more to us than mystic altar fires.

The judgment of the district court will be affirmed.

All the Justices concurring.