## W. C. JONES V. J. C. CALDWELL.

CONTESTED ELECTION; *Duty of a Court.* While it is the duty of a court in a contest over an election, when satisfied that the returns from any precinct were falsely and fraudulently made, or that the ballots counted by the election officers were not the ballots actually cast by the voters, to reject the entire returns; yet it ought not to do so for any mere irregularities on the part of the election officers, or any mere suspicion of wrong, nor unless the fact of wrong is clearly established by the testimony.

### *Original Proceedings in Quo Warranto.*

ACTION in the nature of *quo warranto*, brought originally in this court by *W. C. Jones,* as plaintiff, February 9th, 1878, to try the title to the office of register of deeds of the county of Cherokee—said office being then held and occupied by *J. C. Caldwell,* defendant. The action was tried at the July Term, 1878, of this court, and on the 26th of November, 1878, judgment was rendered for defendant. In the subjoined opinion, all necessary facts and proceedings appear.

*Ritter & Anderson,* and *W. C. Webb,* for plaintiff.

*Stockslager & Spear,* and *John Martin,* for defendant.

The opinion of the court was delivered by

BREWER, J.: The parties to this action were respectively candidates at the November, 1877, election, in Cherokee county, for the office of register of deeds. The canvass by the county board gave defendant 1070, plaintiff 1014, and

one John Whitcraft, 117 votes. Defendant, having received 56 plurality, was declared elected; received the certificate of election, and entered upon the duties of his office. Plaintiff brought this action in this court, claiming that he was in fact elected and entitled to the office. The contest he makes is on the returns from the second and third wards of Empire City, the validity of which he challenges *in toto*, and claims that said returns should be entirely rejected. The returns from those precincts were: 2d ward, Jones 8, Caldwell 117, and Whitcraft, 4 votes; 3d ward, Jones 11, Caldwell 118, Whitcraft, 4 votes. Several witnesses have been examined who testified that they voted in these precincts and voted for plaintiff, but it is not claimed that enough has been shown to change the result by a mere correction of the returns.

It is not pretended that fifty votes are shown to have been cast for Jones in these precincts, and there is no testimony other than the returns showing how many were cast for Caldwell, so that unless the testimony brings the case within the authority of *Russell v. The State, ex rel.*, 11 Kas. 308, and compels the rejection of the entire poll, judgment must go in favor of the defendant. We must therefore examine the testimony, which is quite voluminous. Certain irregularities are shown, as follows: One of the clerks in the second ward was a resident of the first ward. The judges and clerks in these precincts were appointed by the mayor of Empire City, and were not the councilmen, and were not chosen by the voters at the polls. At noon there was an adjournment for dinner, the polls were closed and the ballot-box taken by one of the judges while he went to dinner; and again at night, after the polls were closed, the box was taken away from the polls by one of the judges while he went to supper. So far as these irregularities are concerned, there is not enough to vitiate the election or disturb the returns. We have more than once adverted to the cardinal rule of elections, that mere irregularities on the part of election officers are not sufficient to disfranchise the electors or prevent the will of the people from being carried into effect. (*Gilleland*

*v. Schuyler*, 9 Kas. 569; *Morris v. Vanlaningham*, 11 Kas. 269; *Russell v. The State, ex rel.*, 11 Kas. 308.)

We pass, therefore, to a consideration of the testimony which, in addition to that of these irregularities, is offered to show the falsity of the returns. Twenty witnesses testify that they voted in the second ward and voted for plaintiff, and nineteen testify that they so voted in the third ward. In the second ward no votes were returned as cast for Denison, republican candidate for sheriff, and one hundred and twenty-six were returned for Balmey, his democratic opponent, while several of the above witnesses are positive that they voted for Denison. Two lay stress upon the fact, that prior to the election they played a game of cards to see for which candidate they both should vote, and that the republican won, and in pursuance thereof they both voted for Denison. While the poll-books and the returns in the second ward show only 129 voters, yet 130 ballots were found in the box and returned to the county clerk's office. The regular nominee of the democratic convention for sheriff was, after the adjournment of the convention, taken off the ticket by the county central committee, and Mr. A. J. Balmey substituted. This was done at the instance, in part at least, of Mr. Cheney, the mayor of Empire City, who appointed the judges and clerks at the two contested polls, and seems to have been very active in support of Mr. Balmey's election. The principal fact is, of course, that so many witnesses in the two precincts testify to having voted for Messrs. Jones and Denison, and indeed, the entire republican ticket, when the returns show so few votes. Yet notwithstanding this significant fact, we are constrained to hold, from an examination of the entire testimony, that we are not warranted in summarily striking out the entire returns and giving the office to the plaintiff. And these are briefly the reasons, for we cannot give anything like a detail of the testimony, covering, as it does, over six hundred pages. It is clear that the ballots, which were counted on the night of the election, show the result returned to the county board. In other words, the election officers correctly

counted the ballots which were in the ballot-boxes at the time they commenced counting. Unlike the case of *Hudson v. Solomon*, 19 Kas. 177, where the ballots corrected the returns, ballots and returns here agree.. For this we have the testimony of the three judges in the second ward, and of two judges and two clerks in the third ward; the testimony of the several officers charged with the preservation and custody of the ballots; and lastly, the ballots themselves, which have been produced and examined by us. In the second-ward ballots we found one more democratic ticket than the returns called for; but with that exception, the ballots and returns in both wards agreed. And as in each ward certain candidates on each ticket were scratched, and to a considerable extent, the agreement between the returns and the ballots produced before us makes very strongly in favor of their genuineness. Thus, for instance, in the third ward the republican candidates for state officers received eleven votes and the democratic one hundred and nineteen, while the republican candidate for county treasurer received one hundred and twenty and his democratic opponent but nine. An examination of the ballots shows that this immense change was made by pencil erasures and interlineations on the printed ballots, and not by means of entirely printed split tickets. Such a change could not have taken place without a general knowledge on the part of the electors of the fact and the manner of its accomplishment; and if it was not done, and done in the way it appears to have been done, many witnesses would have been easily found to so testify. In the same ward take the case of the county surveyor, where the republican candidate received seventy-six and his democratic opponent but fifty-eight: the ballots show pencil erasures and interlineations; and these erasures and interlineations are not all in the same handwriting, nor are the names spelled alike, nor are they placed in the same manner upon the tickets. Again, in the second ward the returns show for A. J. Balmey for sheriff, 126 votes, and for J. A. Balmey, two votes. We find two republican tickets in which Mr. Denison's name is

erased and J. A. Balmey's written. We shall have something to say in reference to these tickets in another connection; we are now noticing the evidences that the ballots presented to us are the ballots actually counted by the judges and clerks. And in reference to these erasures, some are on one ticket and some on another. If the ballots presented to us are not the ballots which were counted on the night of the election, some one has taken considerable time and a good deal of pains to fix up a series of ballots to correspond with the returns. Moreover, it appears that during the counting, friends of candidates on each side, as well as some of the candidates themselves, were present and watched the counting, so that if it was not fairly and correctly done, some one of the parties interested would have been apt to discover the error. Indeed, we do not understand counsel to claim that the ballots were not correctly counted, or that we do not have before us the very ballots which were in fact counted; but the claim is, that during the election day the ballots were changed, and, as during both dinner and supper time the ballot-boxes were removed from the polls, and carried by one or other of the judges to his meal, an opportunity for change was afforded, which was improved by the judge in charge. That this opportunity for wrong existed, is clear, but that the wrong was in fact done, there is not the slightest direct evidence. Each judge who had charge of the box during meal time testifies positively that nothing of the kind was done; that he kept the box in such place and manner that no outsider could have interfered therewith. It is true, the ballot-boxes had no special marks upon them; they were simply cigar boxes, with a hole cut in one end to put the ballots in, over which, before adjournment, a piece of paper was pasted. Doubtless, similar boxes were easily accessible, and could have been substituted by the judge in charge with but little danger of detection by his associates on the board at his return. But this is mere surmise. The positive testimony of the only parties shown to have actual knowledge is, that nothing of the kind was done. Other surmises are equally

plausible. The judge receiving and depositing ballots in the box might, unless very closely watched by his associates, have substituted another ballot for the one given him by the voter and deposited the substitute for the ballot given him. The three judges and both clerks might beforehand have arranged a fraud, and wrought it out through the day without detection from the outsiders. But there is not a syllable of testimony to this effect. Such of the officers as were sworn testify squarely to a fair election and an honest count. Moreover, it appears that the place where the box was kept during the election, and in which were the judges and clerks, was open to view; that persons were around electioneering, as is usual about a poll; so that the direct and positive testimony is to the effect of an honest election, and the only substantial thing bearing against it is, that the result is not such as to correspond with the recollection of the voters as to the persons for whom they voted. No one can, from the testimony, place his finger on the time, place and manner of the wrong, if wrong there was. But again: two of the judges in the second ward testify that when they voted one of them took two ballots in his hand, and opened them to give one to his associate, and just then some tobacco juice rolled upon the ballots, and, after some joking remarks about those ballots being marked so that they could be identified, they each voted one of these ballots. We find, among the ballots from that ward brought before us, two such discolored ballots. Again, as we have before remarked, the writing on the scratched tickets was evidently done by different parties. The form of the writing, the differences in the spelling of names, and the way in which the names are placed on the ballots, all tend to show that many persons assisted in preparing those ballots; and yet there are many in which the interlineations are evidently in the same handwriting, as we should expect where some one was at the polls electioneering for a particular person. In short, so far as the ballots themselves can speak — and there are many things which an examination of a parcel

of ballots suggests to one who is familiar with elections — they testify to the integrity of the election.

But what shall be said of these various witnesses who have testified to their votes? Are they all wrong? Is their testimony unworthy of credit? We are far from imputing intentional misstatement to these gentlemen, and yet we cannot but think many of them are mistaken, and these things must be borne in mind in considering their testimony. The election was in November, and the examination of witnesses did not commence until the succeeding April. True, there was a contest instituted soon after the election, and the attention of the public and of many of these witnesses doubtless was early called to the matter; and yet persons who have no special interest may easily forget the form of the ticket, or the names of the candidates for whom they voted, especially when, as in many instances, the candidates were entire strangers to them. Again, some of the witnesses base their knowledge of the tickets they voted from the statements of other parties, being themselves unable to read; and others doubtless imagined they voted the straight party ticket, because they received it from some one understood by them to be of their party, and glancing perhaps at the heading and finding that right, voted without further inquiry, and so in fact voted a split ticket. Some of such tickets we find among the ballots. We have referred to the two witnesses who played cards to determine for whom they should vote for sheriff. One, the democrat, testified that he took a republican ticket, which contained state, county and township officers, tore off the township part, pasted the democratic state ticket over the republican state ticket, erased the name of Hubbard for county commissioner, and wrote the name of Cowan in its place. The republican testified that he voted the straight republican ticket, except that he erased Hubbard's and wrote Cowan's name. They prepared their tickets together. The republican further testified, that after he had voted he received tickets from Mr. Cheney, the mayor, who seemed to be interested in the election of the democratic candidate for

sheriff, and distributed them at the polls. Now, among the ballots, we find two republican tickets, one with the township officers torn off, each with Hubbard's name erased and Cowan's written in its place; and these are the two tickets in which Denison's name is erased, and *J. A.* Balmey instead of *A. J.* Balmey written as the candidate for sheriff. Evidently these two tickets were prepared together. They bear no little similarity to the tickets these gentlemen describe in their testimony. It is an easy matter for a portion of a ticket pasted over another to fall off; and we have half a suspicion that the democrat won at that game of cards.

Still further, there is no imputation on the integrity of the poll-books, or any intimation that the parties named therein did not in fact vote. Nor is there any suggestion that the great bulk of those who voted were democrats, or did not vote the democratic ticket, or were not legally entitled to vote. Should not their choice be respected? Even had the officers done wrong, should the innocent voter be disfranchised? The defendant received fifty-six votes more than his opponent. Conceding that fifty persons voted for plaintiff in these two precincts, and still the defendant received more votes than he. Moreover, or perhaps by way of offset or counter-claim, or to show the unreliability of plaintiff's testimony, the defendant challenges the vote in Crawford township, in which the returns gave him two votes, the plaintiff fifty-six, and Whitcraft sixty-seven, and introduces five witnesses who testify that they voted in that township at that election, and voted for him. The reasons they give for their recollection are as satisfactory as those given by the witnesses for the plaintiff from the precincts which he challenges. And yet we cannot but believe that there was misrecollection or mistake, rather than intentional wrong.

Upon the whole testimony, therefore, in view of the large plurality received by the defendant, and notwithstanding the significant and weighty testimony of the various witnesses of the plaintiff as to whom they voted for, we are constrained to hold that plaintiff has not shown that defendant was not

elected, and therefore judgment must go in favor of the defendant.

All the Justices concurring.