[No. 1863, June 30, 1916.]
## CARABAJAL v. LUCERO.
## TRUJILLO v. SANDOVAL.

### SYLLABUS BY THE COURT.

1.  Section 2070, Code 1915, provides for the contest for "the offices of the officers of the different counties in this state," and prescribes the procedure. Held, that justices of the peace and constables may institute contest proceedings under such statute.                                   P. 33

2. In the absence of a showing of fraud on the part of the election officers, sufficient to invalidate the returns and to cast discredit upon the ballots, preserved as required by law, the individual voters cannot be permitted to testify as to the candidates for whom they voted at an election.

P. 34

3.  Elections conducted fairly and honestly, where no fraud or illegal voting is shown, will not be set aside for mere irregularity in the manner of the appointment of the election officers, or in the conduct of the election.

P. 35

Appeal from District Court, Bernalillo County; H. F. Raynolds, Judge.

Election contests by Juan Carabajal against Camilo Lucero, and Miguel Trujillo against Alfredo Sandoval, consolidated for trial. From judgment for contestants, contestees appeal. Reversed and remanded, with instructions.

MANN & NICHOLAS, both of Albuquerque, for appellants.

Court had jurisdiction to hear and determine these contests.

Sec. 2070, Code 1915; sec. 13, article 6, State Const.; sec. 26, art. 6, N. M. Const.; Territory v. Witt, 16 N. M. 335; Douglass v. Hutchinson, 183 Ill. 323, 55 N. E. 628; King v. Jordan, 198 Ill. 457, 64 N. E. 1072; Flanders v.

Carabajal v. Lucero—Trujillo v. Sandoval, 22 N. M. 30.

Roberts, 182 Mass. 524, 65 N. E. 902; State ex rel. Francis v. Dillon, 87 Mo. 487; Bull v. Southwick, 2 N. M. 321; Vigil v. Pradt, 5 N. M. 161, 20 Pac. 795; Gonzales v. Gallegos, 10 N. M. 372, 62 Pac. 372; Linegar v. Rittenhouse, 94 Ill. 208; Dickey v. Reed, 78 Ill. 261; Batman v. Megowan, 1 Metc. (Ky.) 533; Garrard v. Gallagher, 11 Nev. 382; Dorsey v. Barney, 24 Calif. 449; Saunders v. Haynes, 13 Calif. 150; Taxpayers v. O'Kelly, 49 La. Ann. 396; Rogers v. Johns, 42 Tex. 339; Williamson v. Lane, 52 Tex. 335; Ford v. Wright, 13 Minn. 518; Kindel v. Birt, 13 Colo. 385; Tomkins v. Wiltberger, 56 Ill. 385.

Election results are prima facie evidence of what they show and oral testimony will not be allowed to impeach them.

McCrary Elections (3rd ed.) sec. 480; 15 Cyc. 418; 5 Enc. Evid. 46, 70, 111.

JOHN F. SIMMS of Albuquerque, for appellees.

Court had no jurisdiction to try these cases.

Laws 1865, p. 430 et seq.; sec. 2070 et seq., Code 1915; sec. 2067, Code 1915.

If court had jurisdiction, is its judgment right on the evidence?

Sec. 2079, Code 1915.

### OPINION OF THE COURT.

ROBERTS, C. J.—This is a consolidated case composed of two election contest cases, one for justice of the peace and the other for constable, both of precinct No. 3 of Bernalillo county, N. M. At the election held for justice of the peace and constable in Alameda precinct, Bernalillo county, N. M., in January, 1915, Alfredo M. Sandoval and Camilo Lucero were the Republican candidates for justice of the peace and constable, respectively, and Miguel Trujillo and Juan Carabajal were the Democratic candidates for said offices. The returns showed the elec-

tion of Sandoval as justice of the peace and Lucero as constable, who qualified and entered upon their duties as such.   Trujillo and Carabajal contested this election under the provisions of article 6, chapter 32, Code 1915. Upon the face of the returns the Republican candidates received 96 votes to 74 cast for the Democratic candidates.

Upon the trial the evidence of the contestants consisted of oral evidence given by some 99 voters taken before a referee, each stating that he voted for the Democratic nominees, Trujillo and Carabajal, for justice of the peace and constable, respectively; while contestees' evidence was the returns, the evidence of each of the election officers that the election was fairly conducted, and that the votes were properly counted and as shown by the returns; also the testimony of both the Republican and Democratic watchers to the same effect.   On behalf of the contestants evidence was introduced tending to show that the polls had been open from 15 to 20 minutes before 9 o'clock, while the evidence on behalf of the contestees showed that the polls were not opened until 5 minutes past 9 o'clock. Contestants also attempted to show that persons voting could not see the ballot box or who was inside the polling place, but all of appellants' witnesses and many of appellees' testified that such was not the case, but that the ballot box was in plain view of those outside the room where the election was held.   Evidence on the part of contestants tended to show that the Democratic election judge, appointed by the board of county commissioners, was not allowed to serve as such at such election, but that another judge was selected, either by the remaining judges or by the voters assembled at the polls, and that such selection was made prior to the time that the polls should have been opened, under the law.   Contestees' evidence was to the effect that the third judge was selected because the Democratic judge had not arrived at the polls when the time arrived to open the same and proceed with the election. Some evidence was further introduced by the contestants to the effect that a man named Sais demanded admittance into the room for the purpose of watching the count of

the votes on behalf of the Democratic candidates, and was refused admission. Upon the conclusion of the evidence the court made general findings favorable to the contestants and decreed them entitled to the offices. From this judgment contestees appeal.

[1] The first question raised is the action of the trial court in overruling contestees' plea to the jurisdiction of the trial court; it being appellants' contention that the statute (section 2070, Code 1915), which confers jurisdiction on the district courts to hear election contests, does not apply to nor include precinct officers like the justice of the peace and constable. The statute reads as follows:

"All contests for the offices of the officers of the different counties in this state, shall be commenced in the district court, for the county in which the contest is made; and the notice of contest shall be filed within thirty days after the day on which the county commissioners count the votes of the election from which the contest arises; and the service on the contested shall be made by a copy of said notice of contest, served in the same manner and at the same time, before the first day of the court, as now provided by law for the service of process in civil suits in the district court."

Appellants contend that justices of the peace and constables are not county officers, citing in support of their contention section 1, art. 10, of the Constitution, and Territory v. Witt, 16 N. M. 335, 117 Pac. 860.

The statute under consideration is somewhat ambiguous. It was enacted by the territorial Legislature December 23, 1874, (chapter 29, p. 50), and superseded in this regard the act of July 20, 1851 (Comp. Laws 1865, p. 431 et seq.), which provides as follows:

"Sec. 48. In case any election for probate judge is contested, the party contesting shall give eight days' previous notice to the opposing party, specifying the grounds of the contest, and if any objections are made to persons having voted, they shall be fully specified; said contest shall be heard and determined in a summary manner by the circuit court, or by three justices of the peace selected for the occasion by the contesting and opposing parties.

"Sec. 49. In case any election for sheriff, justices of the peace, or constables be contested, the party contesting shall give eight days' previous notice to the party opposing, in the

same manner as prescribed in the foregoing section, which contest shall be heard and determined in a summary manner by the probate court. In case any election for other subaltern officers, created by law, shall be contested, said contest shall be determined in the manner prescribed by the probate judge."

It will thus be seen that the first act passed relating to this subject specifically authorized the contest of an election for justice of the peace. By the act of December 23, 1874, jurisdiction of the probate court in such matters was abolished and exclusive jurisdiction was conferred upon the district court of the county in which the contest was filed. It was evidently the intention of the Legislature to provide for the contest under such statute for all the officers within the county. The statute does not say "all county officers," but "all contests for the offices of officers of the different counties," having evidently in view the object of providing a simple remedy for election contests for all officers within a county. An officer who resides in a county, such as justice of the peace or constable, is certainly "of the county," in that he resides and exercises his official functions inside the geographical limits of the county; yet he may not be a "county officer," in that his jurisdiction does not extend over the entire county. Hence we conclude that justices of the peace and constables may contest the election of their opponents under the provisions of section 2070, supra.

[2] Appellant further contends that, even if the court had jurisdiction of this cause, there was not sufficient evidence to sustain the contest and to overthrow the official return, that no fraud was shown, and that the voters at the election could not impeach the returns by simply stating, each for himself only, that he voted in a certain way. Appellant admits in his brief that if sufficient evidence had been first introduced by appellees to establish fraud and corruption on the part of the election officials, sufficient to impeach not only the returns but the ballots, that it would be proper to call in the individual voters and inquire of them as to how they voted. The right to do so upon first establishing the fraud is not in-

volved in this case, hence is not before us for consideration, and we are not required to express an opinion in this regard.

Here appellees contend that in view of the general finding of the court for the contestants, it is to be presumed that the trial court found that fraud had been established, but they overlook the fact that the only evidence of fraud consisted in the testimony of the voters to the effect that they had voted in a certain way. In the district court counsel for appellees admitted that the only testimony which had been given to show fraud was the testimony of 95 men who voted Democratic. In answering the contention of appellants, upon a motion to strike out all the testimony in the cause because it was not shown that fraud of any kind was committed at the election, counsel for appellees, in the trial court, said:

"In answer to that, if your honor please, the only thing that tends to show it is the testimony of 95 men out of 166 who voted Democratic and the returns came up the other way."

[**3**] That there were possibly some irregularities in the conduct of the election is not disputed, for giving the evidence of contestants due credit, which we are compelled to do in view of the finding of the trial court, it may be taken for granted that the polls were opened from 15 to 20 minutes before the proper time had arrived; but there is no evidence tending to show that the election officers in so opening the polls did not act in good faith. Upon their part, they testified that at the time the polls were opened the clock in the polling place registered 5 minutes past 9 o'clock, and the watch of one of the judges, which apparently was the only watch there, likewise recorded 5 minutes past 9. Another possible irregularity was in the matter of selecting the third judge. Section 1992, Code 1915, provides that if from any cause they (election judges) fail to attend at their respective precincts at the day of election, it shall be lawful for a majority of the qualified voters in the precinct present at the polls where said vacancy occurs to appoint judges who

shall conduct said election in the same maner and to the same effect as if they had been appointed by the board of county commissioners.  This section contains a proviso to the effect that no more than two such judges shall be of the same political party.  But assuming, although not clearly established by the record, that the judge in question was selected by the two remaining judges, still this would be but an irregularity, which, in the absence of a showing of fraud, would not invalidate the returns.  The authorities uniformly hold that statutes regulating the mere mode of conducting elections are directory, and that any departure from any prescribed mode will not vitiate an election if the irregularity does not deprive any legal voter of his vote or admit a disqualified voter to vote, or cast uncertainty on the result, and has not been occasioned by the agency of a party seeking to derive benefit from it. Cooley Const. Lim. §§ 617 and 618; Gass v. State ex rel. Clark, 34 Ind. 425; Parvin v. Wimberg, 130 Ind. 561, 30 N. E. 790, 15 L. R. A. 775, 30 Am. St. Rep. 254.  In McCrary on Elections, § 228, it is said:

"Those provisions of a statute which affect the time and place of the election, and the legal qualifications of the electors, are generally of the substance of the election, while those touching the recording· and return of the legal votes received, and the mode and manner of conducting the mere details of the election, are directory.  The principle is that irregularities which do not tend to affect the majority are to be respected even when irregularly expressed.  The officers of election may be liable to punishment for a violation of the directory provisions of a statute, yet the people are not to suffer on account of the default of their agents."

It would indeed present an anomalous situation if it were true, as apparently contended by appellees, that the returns of an election in a given precinct would be invalidated by reason of the fact that three of the judges of the election selected by the county commissioners or selected by the people at the polls, all belonged to one political party.  In many precincts in the state all the voters are affiliated with the one party or the other, and it is impossible to select judges and election officers of different political faith.  Suppose, for example, that in a given

precinct no voters of a given political party should be in attendance at the opening of the polls, and the judge appointed to represent such party should not be present, could it be contended that an election could not legally be held in such precinct because it would be impossible to select an election official to represent such party? The very statement of the proposition refutes it. In the case of Wells v. Taylor, 5 Mont. 202, 3 Pac. 255, it is said:

"In election cases the great question is whether the voice of the majority has been honestly and fairly expressed. A qualified voter should not be disfranchised because a judge of the election or a clerk was not properly appointed, or because of some technical irregularity in the returns. The question is: Was there a fair vote and an honest count? If there was, the election is valid, though the officers conducting the same were not duly sworn or chosen, or did not possess the qualifications requisite for the office. 'In the courts of the country the ruling has been uniform; and the validity of the acts of officers of election who are such de facto only, so far as they affect third persons and the public, is nowhere questioned. The doctrine that whole communities of electors may be disfranchised for the time being, and a minority candidate forced into an office because one or more of the judges of election have not been duly sworn, or were not duly chosen, or do not possess all the qualifications requisite for the office, finds no support in the decisions of our judicial tribunals.' McCrary, Elect. p. 98, § 79; People v. Cook, 8 N. Y. 69 [59 Am. Dec. 451]; Taylor v. Taylor, 10 Minn. 107 (Gil. 81); Baird v. Bank of Washington, 11 Serg. & R. (Pa.) 414; Pritchett v. People, 1 Gilman (Ill.) 529; People v. Ammons, 5 Gilman (Ill.) 107; St. Louis Co. v. Sparks, 10 Mo. 121 [45 Am. Dec. 355]; Whipley v. McKune, 12 Cal. 352; People v. Cook, 14 Barb. (N. Y.) 259; Greenleaf v. Low, 4 Denio (N. Y.) 168; Weeks v. Ellis, 2 Barb. (N. Y.) 324; Keyser v. McKissan, 2 Rawle (Pa.) 139; McGregor v. Balch, 14 Vt. 428 [39 Am. Dec. 231]; Hoffa v. Morter, 82 Pa. 297; Morris v. Vanlaningham, 11 Kan. 269; Dishon v. Smith, 10 Iowa, 219."

In the case of Hankey v. Bowman, 82 Minn. 328, 84 N. W. 1002, the court says:

"It is a rule of universal application that elections conducted fairly and honestly, where no fraud or illegal voting is charged or shown, will not be set aside for mere irregularity in the manner of the appointment of the election officers or in the conduct of the election. Peard v. State, 34 Neb. 372, 51 N. W. 828; Wells v. Taylor, 5 Mont. 202, 3 Pac.

255; People v. Cook, 8 N. Y. 67 [59 Am. Dec. 451]; Keller v. Chapman, 34 Cal. 635; Ex parte White, 33 Tex. Cr. R. 594, 28 S. W. 542; Steele v. Calhoun, 61 Miss. 556."

Many additional cases to the same effect could be cited.

Judge Brewer, speaking for the Supreme Court of Kansas, in the case of Gilleland v. Schuyler, 9 Kan. 569, where the clerks of election had not been regularly appointed, but accepted and acted as such, and but two judges acted where the law required three, said:

"And first, as to the irregularity in the mode of appointing or electing the clerks and judges, and the fact that there were but two judges qualified or acting. How the clerks secured their positions we are not told. They should have been appointed by the judges. Gen. Stat. 404, § 3. They were not. Yet the judges accepted them as clerks, recognized them as such. One of the judges was so de jure. Both judges and clerks were officers de facto. They formed an election board. They were recognized as such by all persons having occasion to deal with an election board during the whole term of office of such board. Their acts as such officers can no more be questioned, collaterally, now, than can the acts of one who has served as mayor of a city during a term of two years, with the general recognition of the community, be questioned after the expiration of such term. The manner of their election or appointment is merged in their assumption of power, and the public recognition of their right. The shortness of their term of office does not affect the rule. They were officers de facto during the whole. of the term. In Sprague v. Norway, 31 Cal. 174, the inspectors were appointed by the judges, and not by the electors present, as required by law. Still they were held officers de facto, and the election was sustained. And in State v. Stumpf, 21 Wis. 579, two inspectors acted instead of the statutory board of three. But the provisions of the statute were declared directory, and the election valid. See, also, People v. Cook, 14 Barb. (N. Y.) 285-289, and Id., 8 N. Y. 67 [59 Am. Dec. 451]; People v. Hillard, 29 Ill. 423; Dishon v. Smith, 10 Iowa, 220; McKinney v. O'Connor, 26 Tex. 5; Thompson v. Ewing, 1 Brewst. (Pa.) 99; McCraw v. Harralson, 4 Cold. (Tenn.) 34; Boileau's Case, 2 Pars. Eq. Cas. (Pa.) 503; People v. Cicott, 16 Mich. 324 [97 Am. Dec. 141]."

The only other evidence which, appellees contend, established fraud, other than the testimony of 95 witnesses, is the evidence that the window was raised but two inches and the blind was pulled down to within four or five inches of the bottom, and that it was impossible for the

voters to see the ballot box; but this evidence is denied by many of the appellees' own witnesses. In the case of Gilleland v. Schuyler, supra, the trial court found that the window was so darkened or obscured at the instance and request of a person who was actively engaged in said election, in the interest of the town of Lyndon for county seat of Osage county, and on the evening before said election, and with a view of holding the said election. In speaking of this, Judge Brewer said:

"Concerning those findings which are simply that there were both preparations and opportunities for and inclinations to fraud, it is enough to say that they themselves alone amount to little or nothing. You can never infer guilt from simply a preparation, and an opportunity for, or an inclination to crime. They may be important to sustain or explain the direct or circumstantial proof of the fact of crime."

In this case it is significant that not one word of protest was uttered at the time of the holding of this election as to the arrangements of the window and shade, or as to the appointment of a third judge by the other two judges or by the electors present. In the case of Jones v. Caldwell, 21 Kan. 186, many irregularities were shown. Quoting from the opinion in that case:

"We must therefore examine the testimony, which is quite voluminous. Certain irregularities are shown, as follows: One of the clerks in the second ward was a resident of the first ward. The judges and clerks in these precincts were appointed by the mayor of Empire City, and were not the councilmen, and were not chosen by the voters at the polls. At noon there was an adjournment for dinner, the polls were closed and the ballot box taken by one of the judges while he went to dinner; and again at night, after the polls were closed, the box was taken away from the polls by one of the judges while he went to supper. So far as these irregularities are concerned, there is not enough to vitiate the election or disturb the returns."

From the foregoing we are compelled to conclude that the showing as to the irregularity in the selection of the third judge and the time of the opening of the polls, assuming that the polls were opened 15 minutes prior to the time fixed by statute, and the arrangement of the win-

dow, in the absence of protest, did not constitute sufficient evidence to show fraud upon the part of the election officials and invalidate the returns.

The one remaining question for determination is whether, in the absence of a showing of fraud on the part of election officers in the conduct of the election, or the canvassing of the returns, a court can properly go behind the returns and ballots and inquire of the individual voter as to how he cast his ballot at the election. Appellee has cited no authority justifying the action of the court. Appellants cite McCrary on Elections, § 480 (3d ed.), where the author lays down the rule as follows:

"It is impossible to state more definitely than we have done, the general rule which should govern in determining whether a return should be set aside and the parties on either side be required to prove their actual vote by other evidence. The rule is that the return must stand until impeached; i. e., until shown to be so worthless that the truth cannot be adduced from it."

The only cases we have been able to find directly in point are Commonwealth v. Barry, 98 Ky. 394, 33 S. W. 400, and Major v. Barker, 99 Ky. 305, 35 S. W. 543. In the former case Barry was an election official and was indicted for making false and fraudulent election returns. The commonwealth sought to go behind the returns and ballots and show by the individual voter how he voted. The trial court refused to permit the voters to testify, and the state appealed. The court said:

"It may be conceded that the testimony offered was material and might, if admitted, have convinced the jury that the averments in the indictment were true. Yet the intent of the lawmakers seems to have been to provide an absolutely secret ballot. If evidence can be allowed to be introduced in judicial proceedings showing how or for whom the party voted, it seems to us that one of the safeguards thrown around the voter will, to say the least of it, be weakened or endangered. It seems to be conceded that the voter cannot be compelled to testify as to his vote. If that be true, it would seem to follow that if the ends of justice so demanded, he might be compelled to testify. The election law provides ample means to prevent frauds and forgeries. If the appointing power will take care that good men are appointed to the office of judge, clerk, and sheriff at the several pre-

cincts, frauds will rarely, if ever, occur. And, in addition to this safeguard against frauds, the Legislature has authorized each political party to have a challenger present during the voting, and an inspector present to witness and inspect the count and to receive a certificate of the result. It seems to us that it would be a dangerous practice to allow the official action of the officers of the elections, watched and inspected as it may be by the inspectors, to be contradicted by the parol testimony of the voter."

The case of Major v. Barker, supra, was an election contest case, and the same point arose. The court said:

"It was held in Commonwealth v. Barry [98 Ky. 394], 33 S. W. 400, that such evidence was not admissible upon an indictment for making a false return, but it is insisted that a different rule should apply to a case like the present one, where relief is sought on the ground of fraud. After full consideration of the question, we have concluded to adhere to the rule laid down in Commonwealth v. Barry. It is conceded that the voter cannot be compelled by subpoena to appear and testify how he marked his ballot. If he were permitted to so testify he could then be subjected to a moral compulsion from his party associates. One party might obtain from willing witnesses testimony which the other party would be powerless to rebut because unable to compel a statement of the truth. It is admitted that injustice may be done in individual cases by the application of this rule, but the consideration mentioned and the evident policy of the law that the secrecy of the ballot should be inviolable outweigh the occasional hardships. As was said in the Barry Case, 'the election law provides ample means to prevent frauds and forgeries' if it is adhered to and enforced by the authorities."

It will be observed that in the latter case relief was sought on the ground of fraud. In the case before us resort was not had to the ballots, but contestants sought to disregard the paper ballots and go behind them and prove the result of the election by the testimony of the individual voter, regardless of the paper ballot which he may have voted at the time of the election. It is held in many cases that the ballot cast is the highest evidence of the intention of the voter. In the case of Beardstown v. Virginia, 76 Ill. 34, the paper ballots disclosed that three persons named had voted for the removal of the county seat. The voters testified, however, that they had voted against removal. The court said:

" * * * Nothing more than that is disclosed or claimed, of any fraud or mistake. Appellants insist that the will of the electors should be carried out, and the so-called mistake be corrected. We know of no precedent or principle for such a proceeding. The intention of the elector cannot be thus inquired into when it is opposed to the paper ballot which he has deposited in the ballot box. That is to to prevail as the highest evidence of his intention."

But were no authority to be found on the proposition, upon reason and logic it must be held that it is not competent to impeach election returns in the absence of a showing of fraud or corruption sufficient to invalidate the returns by the testimony of individual voters that they voted for or against a certain candidate. To permit the returns of an election, honestly and fairly conducted, to be overturned by the testimony of the voters is to destroy the safeguards thrown around the secrecy of the ballot, designed to procure an honest and free expression of the voter's choice without intimidation or coercion by any one.

Suppose in a given precinct the election board is made up of men of the highest integrity; that both parties are represented upon the board by officials of each party's selection; that the voters in such voting precinct are all employed by a coal company, or railroad company, or other large employer of labor; that the officials of such company, for some reason, are vitally interested in the selection of a given official; that the employes deem it advisable to select his opponent, and at such election secretly vote for their choice. The candidate of their selection is elected on the face of the returns by a few votes. The rule prevails in the courts for which appellees contend. The defeated candidate resorts to the courts, alleging that in the given precinct all the voters voted for him "and the returns come up for the other man." The officials of the employing company call upon the employes of such company to answer in court as to how they voted. Suppose they refuse to testify, or testify truthfully, might not their positions be imperiled, if the interest of their employers in the premises was intense? Or, on the other hand, suppose that, in order to hold their jobs and provide sustenance for their families, they elect to testify

Carabajal v. Lucero—Trujillo v. Sandoval, 22 N. M. 30.

falsely, would not their testimony, given under coericon, result in the selection of an officer in the courts who was not fairly elected at the polls?

'In this case the court did not resort to the ballots, which, so far as we are informed, were safely preserved, in the manner provided by law, and are the identical ballots cast by the individual voters; presumably these ballots are in accord with the returns made by the officials; presumably the Democratic candidates were represented by a challenger, whose duty it was to see that the ballots cast were deposited in the box; that such party had, upon the election board, a clerk of its own selection; such party had the right under the statute to demand that the votes be counted in public and a reasonable number of voters from each party could have entered the voting place and have watched the count. The statutes provide punishment for election officials who disregard its provisions, and, in the absence of a clear showing of fraud, it is not to be presumed that election officials have violated their oaths and statutory duties.

So far as this record shows, the judges and clerks of election were men of integrity and attempted to discharge their duty in an impartial manner. They may have been honestly mistaken as to the time when the polls were opened and a better view of the interior of the room might have been provided; but no objection in this regard was interposed by any one at the time the election was held, further than a demand by the Democratic election judge that he be inducted into his office. When he was refused admittance because his place had been filled by another man, because he failed to arrive on time, no further objection was made, nor any attempt made to show the board that it had opened the polls prematurely.

The present case affords sufficient example of the wisdom of the rule of law announced. Shortly after this election a man named Bernardo Faulkenrich procured from some 95 voters affidavits to the effect that they had voted for the Democratic candidates for justice of the peace and constable. Many of the voters who voted at this election testified that they were unable to read and

write, some saying that they voted a ticket with a rooster on it, and others that they had not looked at their ticket, but had accepted it from a worker at the polls, all testifying, however, that they had voted, or intended to vote the Democratic ticket. Mr. Faulkenrich, it appeared, was in charge of the constructing of a highway in this precinct upon which, either before or after the election, many of these same voters were hired as employes. All willingly made the affidavits requested by Mr. Faulkenrich. Whether gratitude for having been given work by Mr. Faulkenrich, or whether fear of losing their jobs in case they failed to make the affidavits had anything to do with their actions in the premises, is not clear from the record. But it is apparent that by reason of his position in the community and his right to discharge and hire employes on the roads, the opportunity for coercion and intimidation existed. With the secret ballot, of course it would not be possible for an employer to know how his employes voted, but with an opportunity to hold the election anew in a court where the testimony is necessarily given in public and becomes a public record, it is impossible for the voter to preserve his right to secrecy as to the candidates for whom he may have voted. The above illustration affords ample reason for the rule which precludes the court from going behind the returns and ballots in the absence of fraud to determine how the individual voter voted in order to impeach or invalidate the returns. That a court might so do where there is competent evidence of fraud and corruption sufficient to invalidate the returns and ballots is another question not necessary for us to decide. We hold that the evidence of a voter as to how he voted at an election is incompetent in a contested election case in the absence of proof establishing fraud or corruption on the part of the election officers, sufficient to invalidate the election returns and the original ballots.

For the reasons stated the judgment of the trial court will be reversed and the cause remanded, with instructions to enter judgment for the contestees; and it is so ordered.

HANNA and PARKER, J.J., concur.