| 19 | 177 |
| 45 | 359 |

| 19 | 177 |
| 73 | 140 |

| 19 | 177 |
| 78 | 882 |

## B. F. HUDSON v. H. C. SOLOMON.

1. ELECTION; EVIDENCE; *Ballots Cast; Official Canvass.* As between the ballots cast at an election, and a canvass of those ballots by the election officers, the former are the primary, the controlling evidence.

2. —————— In order to continue the ballots controlling as evidence, it must appear that they have been preserved in the manner and by the officers prescribed in the statute, and that while in such custody they have not been so exposed to the reach of unauthorized persons as to afford a reasonable probability of their having been changed or tampered with.

*Original Proceedings in Quo Warranto.*

ACTION in the nature of *quo warranto*, brought originally in this court by *Hudson*, as plaintiff, to try the title to the office of city attorney of the city of Atchison, held and occupied by *Solomon*, defendant. An election was held in said city for city officers on the 3d of April 1877. Plaintiff and defendant were opposing candidates for city attorney. The city council, sitting as a board of canvassers, canvassed the returns from the several wards, and declared the result for city attorney as follows:

|  | First Ward. | Second W. | Third W. | Fourth W. | TOTALS. |
|---|---|---|---|---|---|
| B. F. HUDSON, | 90 | 120 | 197 | 254 | 661 |
| H. C. SOLOMON, | 137 | 100 | 200 | 244 | 681 |

The plaintiff in his petition alleges that he received 148 votes, and defendant 100 votes, in the *second ward;* that the judges and clerks of election through mistake, misconduct, or fraud, failed, refused, and neglected to count or record 28 votes legally and lawfully cast for said plaintiff for said office, and that said judges and clerks of election in said second ward through mistake, misconduct, or fraud, reported and returned that plaintiff received only 120 votes in said ward, when in truth and in fact he received in said ward 148 votes, and was duly and legally elected to said office of city attorney, and is duly entitled to said office, and authorized to discharge the duties of and to hold and enjoy the same, by reason of said election; that the defendant, well knowing the fact, wrongfully and unlawfully obtained the certificate of election to said office, usurped and intruded himself into said office, and ever since the 7th of April 1877, has unlawfully held, used and exercised the said office, and the franchises and privileges thereto belonging. Plaintiff demanded that judgment of ouster from said office be pronounced against the defendant, and that plaintiff be adjudged to be entitled thereto, and put into possession thereof. Judgment was also asked in favor of plaintiff and against defendant for $1,000 damages. The defendant answered, denying all fraud, mistake, and misconduct on the part of the election officers, and in the count and return of the vote in said second ward, alleging that plaintiff received only 120 votes therein, and not 148 votes, as claimed. It was admitted that there were only four wards and voting precincts in the city, and that the returns from the first, third, and fourth wards were correct. Defendant claimed to be elected by a majority of 20 votes. Defendant's answer also alleges, that after the election the ballots were taken, exposed and altered by unauthorized persons, and carelessly left open in the office of the city clerk of said city for the unauthorized inspection and manipulation of any person who might choose to change, erase, or interfere with said ballots, and by reason thereof defendant claims this court cannot go behind the count and result as certified to by

the election officers.  The answer then alleges that a certificate of election was issued to defendant, and that he qualified and entered upon the duties of said office on April 7th, and has ever since occupied and held the same.  It also denies the right of plaintiff to said office, and prays judgment for defendant.  By stipulation of parties, a reply to said answer was considered as being filed, denying all allegations or averments of any new matter, or any matter inconsistent with the plaintiff's petition, or set up as constituting any defense to said action, or as contradictory thereto.

A trial was had before the court, upon oral and written testimony, and the ballots cast at such election in said second ward were produced and recounted and canvassed.  The count made under the direction of the court, and the material facts, are fully stated in the subjoined opinion.  Elaborate briefs were filed, discussing many questions incident to the case besides those decided by the court.

*Everest & Waggener*, for plaintiff.
*H. C. Solomon*, and *Wm. R. Smith*, for defendant.

The opinion of the court was delivered by

BREWER, J.: The question in this case is as to the number of votes received by the two gentlemen, parties to this action, respectively, in the second ward of the city of Atchison, at the last city election, for the office of city attorney.  The canvass as made by the judges and clerks of election on the night of the election gave Mr. Hudson one hundred and twenty, and Mr. Solomon one hundred votes.  This, in conjunction with the votes in the other wards, elected Mr. Solomon by twenty majority.  A recount of the ballots made in the presence and under the direction of the justices of this court gave Mr. Hudson 143 and Mr. Solomon 100 votes.  In addition, there was found one ballot probably intended for Mr. Hudson, but which owing to the manner in which different parts of it were pinned together was not counted by us as cast for either.  This would elect Mr. Hudson.

The question then is, which should obtain — the canvass of the election officers, or the result as shown by the ballots themselves? It is a primary rule of elections, that the ballots constitute the best, the primary evidence, of the intentions and choice of the voters. *State, ex rel., v. Judge, &c.,* 13 Ala. 805; *People, ex rel., v. Holden,* 28 Cal. 123; McCrary on Elections, §§ 291, 439; Cooley's Const. Lim., p. 625. In the case from California, the court uses this language: "Intrinsically considered, it must be conceded that the ballots themselves are more reliable, and therefore better evidence than a mere summary from them. Into the latter, errors may find their way; but with the former this cannot happen. The relation between the two is at least analagous to that of primary and secondary evidence." A canvass is but a count of the ballots, a convenient and expeditious method of determining the choice of the people as disclosed by the ballots, and therefore but secondary evidence. The necessities of the case make it *prima facie* evidence, but unless expressly so declared by statute, it is never conclusive. *The State, ex rel., v. Marston,* 6 Kas. 524; *Russell v. The State,* 11 Kas. 308. As between therefore the ballots themselves, and a canvass of the ballots, the ballots are controlling. This is of course upon the supposition that we have before us the very ballots that were cast by the voters. And this presents the difficult question in this case. For, as under the manner of our elections there is nothing upon the face of a ballot to identify it as cast by any particular voter, or even as actually used at any election, nothing to distinguish one ballot from another of those cast by the members of the same party, as no file-mark or other mark is made in the canvass or otherwise after the election upon any ballot by which its actual use at such election may thereafter be established, and as at any election there is always a large surplus of unused ballots, it is evident that if opportunity were offered ballots might be withdrawn from the box and others substituted with but little chance of detection. Thus in the case before us, if there was but a single officer to elect, and but a single name on the bal-

lot, how easily could one having access to the box throw in twenty-three or four additional ballots, and thus bring about the very difference that appears before us now? And who could thereafter tell which were actually voted, and which subsequently thrown in? The ballot then upon its face containing no marks of identification, we must look *aliunde* for evidence of the identity of those offered and counted before us with those actually cast at the election. And this evidence we find in the testimony as to the manner in which the ballots have been preserved, a comparison of the canvass made as to all the officers voted for at that election with the result as shown by the ballots, and certain other circumstantial evidence.

And first, as to the preservation of the ballots. It appears that at the night of the election, as the ballots were called off they were strung on a thread, as prescribed by the statute; (Gen. Stat., p. 403, § 20;) that this was done publicly by the judges, in presence of several spectators; that after the canvass thus publicly made had been completed, the ballots as strung together were sealed up in an envelope, duly marked and directed to the city clerk, and with the poll-books deposited in the ballot-box. This box had two covers—one an inside sliding cover, fastened by a screw, and the other an outside lifting cover, fastened by a padlock. Both covers were fastened, and the box and key intrusted to Mr. N. A. Maher, one of the judges of election, to be by him delivered to the city clerk. It appears that after the canvass, which was finished late in the evening, he carried the box with him to the office of "The Champion," where were gathered quite a number of persons to hear the election news. After tarrying there awhile he went home, taking the box with him. He kept the box in his house until the afternoon of the next day, when he carried it to the office of the city clerk, and delivered it to him. While Mr. Maher had it in his house it was deposited in his sleeping-room, and the key carried in his pocket. Mr. Barker, who was city clerk at the time, retained it in his office and custody for six days, when he was suc-

ceeded in office by the present incumbent, Mr. White, by whom it has since been kept, part of the time in his office, and part of the time in the vaults of a bank.   Four days after Mr. White received it, he placed some tape around the box, and sealed it at the corners, and the seals were unbroken when brought into our presence.   It thus appears, that from the time of the canvass to that of our examination the ballots were only in the custody of three persons, each of whom testifies that they were not handled by any one while in his custody.   It appears also, that the box in which were these ballots was itself unlocked and opened but four times, and then only for the purpose of taking out the poll-books.   Now unless we impute to some one of these three parties intentional wrong in opening or permitting to be opened the box, and changing or permitting to be changed the ballots, and in willful false swearing upon this trial — and there is not the least foundation for such an imputation — it would seem that there could be little doubt that the identical ballots cast at that election have been preserved, and preserved unaltered, and were those examined by us.   But it is said that there were opportunities for reaching and opening this box, and changing the ballots; that this might have been done at the "Champion" office, at the house of Mr. Maher, or in the city clerk's office prior to the sealing of the box by Mr. White. It is true, there is a possibility of such a thing; but is there any probability of it?   Take the "Champion" office first, and see what must be assumed.   This was the same night, and immediately after the canvass.   It must be assumed that some one had a motive.   This implies knowledge of the result of the canvass in the four wards, and of the number of ballots that must be changed.   It must be assumed also, that the party having motive had knowledge of the presence of the judge of the second-ward election, with the box and ballots, in the "Champion" office, and had possession of a key fitting the lock of the box — that he could take the box off from the desk of Col. Martin, upon which it was placed by Mr. Maher, in the presence of Mr. Maher and a large num-

ber of parties eager about election matters, that he could take the box out of the room, unlock it, make the changes, and return it to its place upon the desk, and all this without detection and exposure. This is so near the impossible as to be of little moment. Perhaps the improbability may not be so striking as to the other places named, but the opportunity afforded was so slight, that it seems almost like trifling with language to speak of it as an opportunity.

But beyond the direct testimony as to the manner of keeping the box and ballots, there is indirect evidence of value as to the identity of the ballots. The testimony shows that they were strung on a thread, and then placed in a sealed envelope. They were so found by us. It also shows that the straight republican tickets were counted first, then the straight democratic, and then the scratched. And so we found the ballots arranged on the thread. Again, there were several offices to be filled at that election, and each ballot had the names of candidates for the respective offices. So we had a count made of the votes cast for all, so as to compare the result with the canvass. We found the proper number of ballots in the box, so that if any had been put in an equal number had been taken out. For mayor, the canvass gave Mr. Downs 232 votes; our count, 230. For police judge, the canvass gave A. Spalding 164, and G. Scoville 79 votes; our count the same. For marshal, the canvass gave Tofte 130, and Dobson 111 votes; our count, Tofte 129, and Dobson 109. For treasurer of board of education, the canvass gave A. H. Lanphear 235, and our count 236 votes. For member of board of education, the canvass gave A. F. Martin 240, and our count 235 votes. For city treasurer, the canvass gave Wm. Bowman 142 votes, and J. M. Lindley 82; our count, Bowman 163, and Lindley 82. So that except as to Bowman for treasurer, and Hudson for city attorney, the canvass and our count substantially agreed. If any change therefore had been made in the ballots as to plaintiff, it must have been so made as not to increase the total number of ballots, as to preserve to Mr. Solomon the same number of votes, to add 23 votes to

Mr. Hudson, and leave unchanged the votes for all the other officers except one of the candidates for city treasurer. The difficulty of accomplishing this can only be fully appreciated by one who sits down with 240 ballots, nearly half of which are scratched, and attempts to make the changes.

But again, it will be perceived that the only substantial differences between the canvass and our count are in the votes cast for plaintiff and for Mr. Bowman. Now the testimony, taken by deposition long before our count, shows that at the time of the canvass there was some discrepancy between the two clerks in tallying the votes for these officers, and that it was claimed that Mr. Tibbals, one of the clerks, had tallied too many votes for these gentlemen, and an attempt was made to correct his tally-sheets. An examination of the tally-sheet kept by Mr. Tibbals shows that he tallied 155 votes for Mr. Hudson, and 157 for Mr. Bowman; but the tallies made by the other clerk, Mr. O'Keefe, were accepted as correct, and Mr. Tibbals' sheet corrected accordingly. It is not pretended that the correction was made by a recount of the votes, but simply that the tallies were fixed up to the satisfaction of the judges. Over the tallies for these two gentlemen (as they appear on the sheet of Mr. O'Keefe) appears a series of dots, corroborating the testimony that at the time of the canvass there was some trouble about the tallies for these officers. All this testimony taken together forces the conviction on our minds that the ballots have not been changed or tampered with. It is true, there is testimony tending in the other direction, the strongest perhaps being that of a disinterested party, who was present at the night of the canvass and kept a tally of the votes for three of the offices, including that of city attorney, as called off by the judges, and testifies that his tally corresponded with the result as shown by Mr. O'Keefe's sheet, and as returned by the canvassing officers. But it is not to be presumed that an outsider, having no interest in the matter, would be as careful as the sworn officers; and the fact is established by the testimony, and patent from the tally-sheets, that there was a discrepancy between the two clerks

as to these two offices; and it is undisputed that the discrepancy was attempted to be corrected without a recount. Other testimony of the judges and clerks, that they made an honest canvass, while it is good and satisfactory evidence of the honesty of their intentions, does not preclude the possibility of a mistake, a mistake which their own tally-sheets show was made by one or the other of their clerks, and which the count made by us shows resulted to the prejudice of the plaintiff's rights.

Some days after the trial had been completed, and the case submitted to us for decision, an application was made by defendant to reopen the trial for the admission of further testimony. The application was based upon these facts: The poll-books show the casting of ·245 votes. It appeared that one ballot was rejected. Our count gave to the two candidates 243 votes. Now the defendant files affidavits to the effect, that several ballots were cast upon which there was no name for city attorney. Such testimony might be very important. If for instance it could be clearly established that five ballots were cast with the name of no one thereon for the office of city attorney, the inference would seem irresistible, that the ballots before us were not the same as those canvassed, or at least not untampered with. After reflection, and with some hesitation, we feel constrained to overrule the application. It was not claimed as a right, but was an appeal to the discretion of the court, and was refused principally for these reasons. The plaintiff's petition distinctly gave notice of this question. It conceded that 100 votes were cast for Mr. Solomon, and alleged that 148 votes were cast for Mr. Hudson. So that it would plainly tend to defeat the plaintiff's case to show that there were several ballots upon which was the name of neither candidate, and reference was made to this fact in the testimony. Now, there is nothing in the affidavits to show any good reason why this testimony was not introduced upon the trial. Some of the gentlemen whose affidavits were filed were witnesses already sworn and examined. The defendant is too good a lawyer not to have seen

13—19 KAS.

Hudson v. Solomon.

the value of such testimony. The manner in which he has conducted this case shows that he thoroughly understands the strong points in his favor, and that he has prepared his defense with care and industry. Again, to open the case for new testimony would naturally work delay, and already half the term of office has expired. Further delay should only be granted upon the clearest showing. And again, the testimony offered is of a character which, conceding the utmost good faith, and entire honesty of the affiants, our knowledge of elections, and the manner of conducting them, satisfies us is very liable to be weakened if not entirely overthrown upon cross-examination.

We have given to this case more attention than perhaps the importance of the office justifies. The contest is about a city office, of small salary, short term, and not the highest importance. It is a contest which we think ought to have been commenced and terminated in the district court. But having been brought in this court, it has given us an occasion for examination of some matters of importance in reference to elections, and enables us to lay down these as cardinal rules governing elections and election contests:

1st. As between the ballots cast at an election, and a canvass of these ballots by the election officers, the former are the primary, the controlling evidence.

2d. In order to continue the ballots controlling as evidence, it must appear that they have been preserved in the manner and by the officers prescribed in the statute, and that while in such custody they have not been so exposed to the reach of unauthorized persons as to afford a reasonable probability of their having been changed or tampered with.

Judgment will be entered in favor of the plaintiff for the possession of the office, and $473, the amount of salary and fees admitted to have been received by the defendant as city attorney.

All the Justices concurring.