159  51
164  34

WINDES, Appellant, v. NELSON.

In Banc, December 18, 1900.

1. **Election: RETURNS: PRIMA FACIE EVIDENCE.** The returns of the judges and clerks of election are, prima facie, evidence of the facts stated on the face of the returns.

2. ————: ————: ————: **BASIS AND EXTENT OF PRESUMPTION.** This doctrine rests upon three presumptions: first, that sworn officers act honestly and in good faith; second, that they perform their duties with care; and third, that the votes received by them are legal votes. The first presumption may be rebutted by proof showing that the duties were so carelessly performed that there were opportunities for others to commit frauds, and that they have probably been committed, and may be partially rebutted by proof of mistake; but if this mistake can be corrected, the presumption of correctness will be destroyed only so far as the mistake is shown, and the returns will stand with the mistake corrected. The presumption as to the legality of the vote can be partially rebutted by showing that particular votes cast were illegal; but unless the number of cases proved is so great as to amount to proof of fraud, the accuracy of the general return will not be affected, but it will be corrected by deducting the illegal votes.

3. ————: ————: **WHERE OFFICER IS CANDIDATE: PRESUMPTION OF GOOD FAITH.** The presumption of good faith on the part of the election officers may be rebutted, and when it is shown that they are parties to the fraud, the value of the returns as evidence is destroyed; and the fact that a much larger number of votes is returned than the poll book shows to have been cast, will be a circumstance tending to prove fraud. Where the number is large and the fact is unexplained, it will be conclusive.

4. ————: ————: ————: **BALLOTS AS EVIDENCE.** Ballots in order to be received in evidence in an election contest must have remained in the custody of the proper officers of the law, from the time of the original official count until they are produced before the proper court or officer, and if it appear that they have been handled by unauthorized persons, or that they have been left in an exposed or improper place, they can not be offered to overcome the official count.

Windes v. Nelson.

5. ——: ——: ——: ——: CASE STATED. The official returns gave the contestee who was county clerk and in whose custody the ballots were by law placed, a majority of ten votes. The second count, made in the presence of attorneys for both sides, gave him a majority of 91 votes. The contestee and his deputies swore that the ballots had been faithfully kept and had not been tampered with. But the contestant called thirty witnesses, whose testimony stands uncontradicted, and the witnesses unimpeached, who swore that when they deposited their ballots they contained the name of the contestant for county clerk, but when their ballots were examined they showed the name of the contestant scratched out and no other name inserted for that office. It was also shown that the eighty-one changes were in the interest of the contestee, the county clerk, in whose custody the ballots were. *Held*, first, that this evidence shows that the ballots were altered after they left the hands of the election judges and clerks; second, the fraud being shown, and the ballots in the custody of the county clerk, the contestee, the law presumes that the change was made for his benefit; third, the ballots having been shown to be altered, they can not be used to overcome the prima facie case made by the returns; fourth, the fraud does not authorize the court to throw out all the votes cast for the contestee, but only the eighty-one shown to have been altered between the time the returns were received and the recount, and if contestee yet has a majority of the legal unchallenged votes he will be permitted to remain in office.

6 ——: WEIGHING FACTS ON APPEAL. The rule of appellate practice that the court will not weigh the facts upon which the trial court based its finding or the verdict is founded, if there is substantial evidence on which to base its finding, will not be permitted to stand in the way of discovering and denouncing fraud upon the elective franchise.

7. ——: SECRECY OF BALLOT. In an election contest, on a recount, the ballots should not be compared with the poll books and a report made to the court of the result of such comparison, to the extent of showing how every voter in the county voted. This destroys the secrecy of the ballot.

Appeal from Greene Circuit Court.—*Hon. Jas. T. Neville*, Judge.

AFFIRMED.

*Nixon & Carter* for appellant.

(1) The court should not have admitted the record of recount made by and offered in evidence by the contestee for the purpose of showing that he received a greater number of votes than originally certified by judges and clerks of election. The evidence in this case is overwhelming that while the ballots were in the hands of the contestee they were changed and tampered with. Sone v. Williams, 130 Mo. 531. (2) The court erred in striking out those portions of contestant's notice which challenged as illegal a large number of voters for contestee who did not vote in the precincts in which they resided. R. S. 1889, secs. 4660 to 4663. (3) The court erred in finding the issues for the contestee. The evidence shows that the ballots had been tampered with after the election so that the actual votes given for the contestant could not be ascertained at the recount, and under the law given by the court the findings should have been for the contestant. Hipsley v. Railroad, 88 Mo. 348; Powell v. Railroad, 76 Mo. 80; Whitsett v. Renson, 79 Mo. 258; State v. Primm, 98 Mo. 373; Moore v. Davis, 51 Mo. 233; Massey v. Stanley, 54 Mo. 419.

*Moore & Williams* for respondent.

As this case is presented in this court, the real question to be passed on is, shall the findings of the lower court be set aside, on the ground that they are not supported by the evidence? (1) The court gave all the instructions asked by the contestant. It made a special finding of facts, as requested by contestant after a careful consideration and analysis of the evidence, and upon the charge of fraud, which appellant presents in his brief, as the paramount issue, the

court, sitting as a jury, found in favor of the respondent. The findings of the court are conclusive. Nash v. Craig, 134 Mo. 360. (2) The Supreme Court will not weigh the evidence and determine whether or not the finding of the trial court, sitting as a jury, was correct. Bray v. Kemp, 113 Mo. 554; Miller v. Breneke, 83. Mo. 163; Skinker v. Haagsma, 99 Mo. 209; Wischmeyer v. Richardson, 153 Mo. 557; Easly v. Elliott, 43 Mo. 289; Wire Co. v. Hall, 97 Mo. 289; Cunningham v. Snow, 82 Mo. 593. The same rule applies to the verdict of a jury where there are no errors of law against the appellant, in the giving or refusing of instructions. Brown v. Railroad, 50 Mo. 461; Culbertson v. Hill, 87 Mo. 553; Blanton v. Dold, 109 Mo. 65. It is only when prejudice, partiality, corruption or gross ignorance is imputed to a jury that the Supreme Court will interfere. Baker v. Stonebraker, Admr., 36 Mo. 338; McFarland v. Accident Ass'n, 124 Mo. 222; Erwin v. Railroad, 96 Mo. 290. (3) The appellant can not complain because the court made a special finding of facts, and also gave his instructions. It was not incumbent on the court to pursue both courses, but it did so at the request of contestant, and such findings are binding on the appellate court. Kortuba v. Miller, 137 Mo. 173; Nichols v. Carter, 49 Mo. App. 402; Vette v. LaBarge, 64 Mo. 185. The appellant saved no exceptions to the finding of the court on the issues of fact. Loewen v. Forsee, 137 Mo. 38. (4) The court found on all the issues necessary to decide the case. Mackey v. Mayes, 73 Mo. App. 495. (5) The ballots were shown to be intact, as voted by the electors, when the first recount was had in April, 1899, and this by uncontroverted evidence of the witnesses present, who carefully inspected each ballot. It would be dangerous to permit the evidence of individual voters, given a year after the election, to overthrow such evidence and the presumption

of law that an officer has done his duty.    (6) If it be conceded that the character of evidence referred to, is competent, it does not, by any means, necessarily overturn the presumptions and evidence in favor of contestee.    Ferguson v. Henry, 95 Iowa 439; Pedigo v. Grimes, 113 Ind. 148; 10 Am. and Eng. Ency. of Law, 537.    (7) As the original returns gave the contestee, Nelson, a majority, to overturn the canvass of the election officers, the contestant must rely on the ballots as shown by the recount.    If the recount is good for one purpose, it is good for all purposes.    If the recount is rejected, then the official return must stand.    This is clear from careful consideration of the statutes governing contests, as also from the authorities.    Sone v. Williams, 130 Mo. 555; McCrary, Elections (2 Ed.), secs. 277-278; Tebbe v. Smith, 108 Cal. 105; 10 Am. and Eng. Ency. of Law, 829 and 830; Kendree v. Hayden (Neb.), 60 N. W. 1034.

*W. M. Williams*, with *J. P. Nixon* and *E. M. Carter* for appellant in reply.

(1) The contestee claims that certain ballots were cast for him that were not so counted in the returns made by the election judges.    He offers to prove this by the ballots themselves as shown by the recount.    This offer is made in support of his counter notice.    The question to be determined necessarily is, were these votes given for said contestee.    He relies upon the ballots for proof thereof.    Of course the ballots would not prove that they were cast for him, unless in the same condition when offered in evidence as they were when they went into the box.    The question presented by his counter notice is not what do the ballots show, but how many votes were given to contestee.    The ballots are evidence upon that question, but they must be the ballots cast by the

voters.    Any evidence showing they were not the identical votes so cast would necessarily be competent upon the issue as to the actual number of ballots for the contestee.    Ferguson v. Henry, 95 Iowa 442; Sone v. Williams, 130 Mo. 556. (2)  The finding of facts is totally insufficient to authorize the judgment.    Land Co. v. Bretz, 125 Mo. 418; Blount v. Spratt, 113 Mo. 48; Hamill v. Talbot, 72 Mo. App. 22.

Respondent's supplemental brief.

(1)  The certificate of the clerk as to the result of the recount, becomes prima facie evidence of the facts stated therein.   R. S. 1889, sec. 4726.   The burden is on the party relying upon the ballots to overturn the canvass of the election officers, to show that they have been preserved in the manner prescribed by law.    Sone v. Williams, 130 Mo. 555; 10 Am. and Eng. Ency. of Law, 831; Ferguson v. Henry, 95 Iowa 437.    (2)  Having submitted the case on instructions, the appellant can not complain of the findings upon any question at issue on which he failed to ask declarations of law.    Feary v. O'Neill, 149 Mo. 477; Gumm v. Hubbard, 97 Mo. 321. (3)  If the finding of facts is attacked as not embracing all the issues of fact, that should be made to appear by a bill preserving the evidence.    Nichols v. Carter, 49 Mo. App. 405.

MARSHALL, J.—This is a contested election case for the office of clerk of the county court of Camden county, growing out of the election held in 1898.

The contestee was the incumbent of that office, and was the nominee of the Republican party for re-election to that office, and the contestant was the nominee of the Democratic party.   The returns of the judges and clerks of election

showed that the contestee was elected by a majority of ten votes; that is, that contestant received 1179 votes, contestee received 1189 votes, and that there were 54 other votes cast at election but were not cast for either party, making a total of 2422 votes. The contestee issued to himself a certificate of election. On the 28th of November, 1898, the contestant served on the contestee a notice of contest. On the 8th of December, 1898, the contestee petitioned the clerk of the circuit court to issue an order on the contestee, himself, the clerk of the county court, in whose custody the ballots, returns, tally sheets, poll books, etc., were, for a recount of the ballots. The circuit clerk issued the order, the contestee notified the contestant that the recount would be had on December 15, 1898. But it was postponed from time to time until April 12, 1899, when it was begun in the presence of the parties and their attorneys, and the deputy county clerk, who was a son of the contestee, with the result that it appeared that the contestee had been elected by a majority of 93 votes, instead of ten, as shown by the returns of the judges and clerks of election. At the February term, 1899, the contestant procured the venue to be changed from the circuit court of Camden county to the circuit court of Greene county. On the 22d of June, 1899, the contestant filed an amended notice of contest, the contestee filed an answer thereto, and on the 15th of September, 1899, the contestant filed a reply. On the 12th of October, 1899, on motion of contestant, the circuit court of Greene county ordered a recount, which was conducted as before, and resulted in showing that the contestee had received a majority of 91 votes; that is, that the contestee received 1211 votes, the contestant received 1120 votes, there were 91 votes cast at the election but neither party hereto was voted for, making a total of 2422 votes.

On the 11th of November, 1899, the contestant filed a

second amended notice of contest, claiming that he had been elected and assigning as ground of contest, that 118 persons (whose names were set out) had voted for the contestee, when, for various reasons assigned, they were not entitled to vote. The contestee answered and claimed that 131 persons (whose names were set out) had voted for contestant, when, for various reasons assigned, they were not entitled to vote; that 45 votes were cast for Harrison H. Windes, the nominee of the People's party for said office, and improperly counted for the contestant; that the entire vote of Mack's Creek precinct was illegal and should be rejected, because the judges and clerks of election did not give to each voter a copy of each and all of the official ballots furnished them, but gave to each voter only a copy of the ballot containing the nominees of the political party the judges knew or believed the voter belonged to or such as the voter indicated that he preferred, and that the voters did not retire alone to the booth and prepare their ballots, but were permitted by the judges to prepare and cast their ballots without doing so. On the 15th of November, 1899, the contestant filed a reply in which he denied that the votes cast at the election were properly counted and canvassed by judges and clerks; averred that a large number of votes actually cast for contestant were, by mistake, not counted for him by the judges, which if properly counted would have given contestant a majority of several hundred votes; "and that said contestee, well knowing said fact, after the poll books and ballots had been delivered into his custody as county clerk, for the purpose of preventing the discovery of such mistake, mutilated and changed the ballots in his possession so that when a recount was had under this proceeding it became impossible to determine precisely the number of votes actually cast for him and contestee respectively at said general election. And the con-

testant further states that the errors charged by the contestee in counting the votes by the judges and clerks of election, as stated in his notice of contest, and as appears upon the face of the ballots on the recount, were not the actual ballots cast by the voters at said general election, but the said ballots were changed after they were received into the custody of the contestee as said county clerk, and were made in his interest to defeat the rights of the contestant herein."

The case was tried in the circuit court in November, 1899.

The difference between the vote as shown by the returns of the judges and clerks and as shown upon the second recount in October, 1899, has been compressed into tabular form by counsel for contestant, and is not controverted by counsel for contestee, and is as follows:

| Townships—Precincts. | Votes cast for Co. Clerk as shown by returns of judges and clerks of election. | | | | Total results in ballots. | Vote on County Clerk as shown by recount, after it had been changed. | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Nelson votes.... | Windes votes.... | Non-voting...... | Total votes cast..... | | Nelson votes.... | Windes votes.... | Non-voting...... | Total votes cast.... | Windes loses scratches | Nelson gains insertions.. | Nelson's total gains.... |
| | A | B | C | D | | A1 | B1 | C1 | D1 | | | |
| **Adair—** | | | | | | | | | | | | |
| 1. Climax Springs.. | 78 | 79 | 5 | 162 | Windes' name scratched from 5 ballots; Nelson's name inserted on 1 ballot. | 79 | 74 | 9 | 162 | 6 | 1 | 6 |
| **Adair—** | | | | | | | | | | | | |
| 2. Crittenden....... | 84 | 49 | 2 | 135 | Windes' name scratched from 3 ballots, which makes the account stand..... | 84 | 46 | 5 | 135 | 3 | 1 | 3 |
| **Adair—** | | | | | | | | | | | | |
| 3. Iron Works...... | 50 | 91 | 5 | 146 | Windes' name scratched from 8 ballots; Nelson's name inserted on 1 ballot. | 51 | 83 | 12 | 146 | 8 | | 9 |
| **Auglaize—** | | | | | | | | | | | | |
| 4. Stoutland........ | 73 | 98 | 4 | 175 | Windes' name scratched from only 1 ballot, which results......... | 73 | 97 | 5 | 175 | 1 | 1 | 1 |
| **Auglaize—** | | | | | | | | | | | | |
| 5. Traw's Mill...... | 147 | 116 | 11 | 274 | Nelson's name inserted on 3 ballots, which makes the account. ... ........ | 150 | 116 | 8 | 274 | | 3 | 3 |
| **Jackson—** | | | | | | | | | | | | |
| 6. Toronto...... ... | 181 | 74 | 3 | 208 | Mistake of 1 vote in Windes' favor...... | 131 | 75 | 2 | 208 | | | |
| **Jasper—** | | | | | | | | | | | | |
| 7. Shawnee Bend... | 44 | 67 | 3 | 114 | Windes' name scratched from 4 ballots; Nelson's name inserted on 1 ballot... | 45 | 63 | 6 | 114 | 4 | 1 | 5 |
| **Osage—** | | | | | | | | | | | | |
| 8. Linn Creek...... | 327 | 279 | 5 | 611 | Windes' name scratched from 23 ballots; Nelson's name inserted on 11 ballots.. | 338 | 256 | 17 | 611 | 23 | 11 | 34 |
| **Russell—** | | | | | | | | | | | | |
| 9. Coelleda........ | 22 | 42 | 4 | 68 | Windes' name scratched from 6 ballots; Nelson's name inserted on 1 ballot.. .. | 23 | 36 | 9 | 68 | 6 | 1 | 7 |
| **Russell—** | | | | | | | | | | | | |
| 10. Edith.... . ...... | 35 | 47 | 1 | 83 | No changes..... | 35 | 47 | 1 | 83 | | | |
| **Russell—** | | | | | | | | | | | | |
| 11. Mack's Creek... | 81 | 184 | 4 | 219 | Windes' name scratched from 7 ballots; Nelson's name inserted on 1 ballot...... | 82 | 127 | 10 | 219 | 7 | 1 | 6 |
| **Warren—** | | | | | | | | | | | | |
| 12. Decaturville..... | 72 | 33 | | 105 | No changes...... | 72 | 83 | | 105 | | | |
| **Warren—** | | | | | | | | | | | | |
| 13. Gunter......... | 45 | 70 | 7 | 122 | Windes' name scratched from 3 ballots; Nelson's name inserted on 3 ballots.... | 48 | 67 | 7 | 122 | 3 | 3 | 6 |
| Totals. ........... | 1189 | 1179 | 54 | 2422 | Total results in ballots. ...... ...... | 1211 | 1120 | 91 | 2422 | 60 | 22 | 82* |

*Off 1-81.

The contestant showed by the testimony of thirty witnesses that they voted for the contestant. The recount showed that the ballots of these thirty voters had the name of the contestant scratched and no other name inserted for that office.

The contestee showed that the ballots had been kept in his office, tied up in sacks, and the mouths of the sacks tied and sealed up, and the sacks inclosed in wooden boxes, and that 'he or some of his deputies had guarded them every day and some one of them had slept in the office with them from the time they were delivered to him by the judges and clerks of election until they were recounted in April, 1899, and that none of them had been opened, except that as to the returns from Edith precinct of Russell township the judges and clerks had sealed up the returns in the sack with the ballots and that sack had to be opened to get the returns, and that none of them had been changed or tampered with in any way. The recount showed no difference in this precinct from the vote shown by the returns.

Testimony bearing upon the other issues was introduced but it is not referred to here because no point is made on this appeal as to any such other issues.

The contestant asked sixteen instructions, and the court gave them all. The contestee asked no instruction, but at his request the court made a special finding of facts as follows:

"Comes now on this day (December 1, 1899) the parties in the above cause, the contestant and contestee, in their proper persons, and by their respective attorneys, and this cause coming on for hearing, said parties announce ready for trial; thereupon issue being joined, and a jury waived by consent of parties, this cause is submitted to the court for hearing, and the court, after hearing all the evidence in the

case, pro and con, and the arguments of counsel in the case, and the premises being seen and fully understood, makes the following written finding of facts, to-wit:

"The evidence in this case, taken as a whole, and all considered together, with all the presumptions of law necessarily to be indulged does not preponderate in favor of the contention that the contestee tampered with the ballots or permitted the same to be done, and I therefore rule that contention against the contestant.

"As to claim with reference to voters voting in their townships, but not in their proper precincts, I rule that contention against the contestant and hold that by law they were entitled to vote at any precinct within the township.

"As to the contention that at certain precincts a proper and legal vote was not had, by reason of the failure to comply fully with the Australian ballot law, I rule that contention against the contestant.

"As to the challenges made by the contestant, I sustain the following, to-wit: William Michael, D. N. Byler, S. T. Rector, Frank Stephens, Thomas Kelsey, George Sanderson, Frank Jones, James Kelsey, William Jester, J. E. Wilkerson, J. A. Long, August Kerner, W. G. Osborn, Z. T. Jones, George Ray, Joe Shaw, Joe Shaw (voted two numbers), J. C. Simpson, J. M. O'Halloran, W. M. Phillips and Alonzo Huddleston, making 21 in all, which taken from the number returned by the clerk on the second recount, leaves the contestee's entire vote 1,190.

"As to the challenges made by contestee to votes where the title of the office is erased, I rule against the contestee and hold that the intention of the voter is manifest to vote as they were counted by the clerk.

"As to discrepancies in the name of Windes, the contestant, on some of the ballots, I hold that it is sufficiently

plain from said ballots that they intended to vote for Windes, and rule against the contestee as to those votes.

"As to the challenges made by the contestee, I sustain the following: J. W. Hale, James M. Hale, Tom Foster, Robert Gilbert, George Moulder, Joe Appleton, H. C. Brisendine, Isaac Whitedeer, John Fitzpatrick, Hugh Russell, A. F. George, J. W. Anderson, Sam Kiplinger, J. P. Groom, John Cornett, Elmer Hix and S. T. McGuire, making 17 in all.

"The contention of the contestee that 45 votes cast for Harrison H. Windes should not be counted for the contestant, I rule against the contestee and count said votes for the contestant, giving him a total of 1,120, which after deducting therefore the 17 illegal votes, leaves a balance of 1,103 legal votes cast for the contestant.

"As to the other challenges made by both contestant and contestee, they are not, in my opinion, sustained by the evidence.

"A summary of the legal votes, as I find from the evidence to have been cast, is as follows: Owen A. Nelson received 1,190 votes; Henry H. Windes received 1,103 votes. Nelson's majority, 87 votes.

"The contestee is entitled to hold the office."

Judgment was accordingly entered for the contestee, and after proper steps contestant appealed.

## I.

The only point argued or relied upon in the able brief for the contestant is that the ballots were changed between the time they were delivered by the judges and clerks of election to the contestee, as clerk of the court, and the time they were recounted, with the result that instead of the contestee

having only ten majority, the recount shows he was elected by 91 majority. Hence it is asserted that the integrity of the ballots has been destroyed, their value as evidence taken away, and a fraud to the benefit of contestee shown, and hence the whole vote for the contestee (or at any rate the vote in Adair and Osage townships) should be thrown out and the office awarded to the contestant.

This position is illustrated by two instructions asked by the contestant and given by the trial court, as follows:

"1.   The court declares the law of this case to be that Owen A. Nelson, contestee, being a party to this proceeding and the party into whose custody the ballots and poll books of the general election in Camden county were delivered in 1898, and who was charged by the law with the protection of the same, so that in case of a contest the identical ballots might be produced in evidence in the same condition in which they were cast at the election, and if the court from the evidence sh'all find that the said ballots were tampered with by the said Nelson, or any other party in his interest by his knowledge or consent, then this certificate on recount as to all such ballots voted at the said election for contestant are admissions on his part that said ballots were so voted, the same being admissions against interest, and as to his certificate on recount as to all other ballots purporting to have been cast for himself, the same should be rejected as evidence of what votes were case for contestee.

"2.   The court declares the law of this case that if it be found from the evidence that after the poll books and ballots were delivered into the custody of the contestee, he changed such ballots or that thy were changed in his interest and with his knowledge or consent, and that by reason of such fraud the ballots cast at the said general election in Adair and Osage townships in Camden county, Missouri, became

so tainted with fraud that the real condition of the ballots at the time they were delivered into the custody of the contestee could not be ascertained at the recount of such votes in this case, then the entire vote cast for contestee in said townships should be rejected."

The result desired by contestant was not attained in the circuit court for the reason that while the court agreed with the contestant as to the law as expressed in the instructions given, it found against him on the facts and held that, "the evidence in this case, taken as a whole, and all considered together, with all the presumptions of law necessarily to be indulged, does not preponderate in favor of the contention that the contestee tampered with the ballots or permitted the same to be done, and I therefore rule that contention against the contestant."

Contestant does not claim that the trial court erred in any matter of law, but that the finding of fact is erroneous. Hence he asks this court to agree with the trial court on the law declared by it and to reverse the finding of fact.

If the theory of contestant's first instruction is correct, and if the fact be that the ballots were tampered with and changed after they came into the hands of the contestee as county clerk, of course the contestant would have to be declared elected, for in that event the only votes remaining to be considered would be those for the contestant.

On the other hand, if the theory of the contestant's second instruction is the true law, then the contestee's vote in Adair and Osage townships, aggregating 549 votes, would have to be discarded, and deducting 549 votes from contestee's vote of 1189, as shown by the returns of the judges and clerks, would leave him only 640 votes as against contestant's 1179 votes, or deducting the 549 votes from the contestee's 1211 votes as shown by the recount, would leave

Vol 159 mo—5

him only 662 votes as against contestant's 1,120 votes.   In either event the contestant would be elected.

The returns of the judges and clerks of election are, prima facie evidence of the facts stated upon the face of the returns. "This doctrine rests upon three presumptions: first, that sworn officers will act honestly and in good faith; second, that they will perform their duties with care; and third, that the votes received by them will be legal votes.   The first presumption will be rebutted by proof showing that the duties were so carelessly performed that there were opportunities for others to commit frauds, and that they have probably been committed, and may be partially rebutted by proof of mistake; but if this mistake can be corrected, the presumption of correctness will be destroyed only so far as the mistake is shown, and the return will stand with the mistake corrected.   The presumption as to the legality of the vote can be partially rebutted by showing that particular votes cast were illegal; but unless the number of cases proved is so great as to amount to proof of fraud, the accuracy of the general return will not be affected, but it will be corrected by deducting the illegal vote." [10 Am. and Eng. Ency. of Law (2 Ed.), p. 829.]

"Where ballots are preserved, so that their identity is assured, and they can be counted during a contest, they are undoubtedly better evidence of the vote cast than the returns, and should prevail where there is a difference. . . . . Before a recount of ballots should be allowed to rebut the presumption of the correctness of the official returns, it should be proved satisfactorily that the ballots have not been tampered with since the election, and that those offered in evidence are the identical ones cast. . . . . Where the statute provides that the ballots shall be kept in a certain way, and they are in the hands of the proper officer, it is presumed that he has done

his duty; and the burden of proof is upon those assailing them to show that they might have been tampered with.   On the other hand, when it is made to appear that the statutory provisions have not been complied with, this fact alone does not render the ballots inadmissible, but merely throws upon the person who asks the recount the burden of proof to show that they have not been tampered with; but this is a question of fact to be determined by the jury or the court trying the issues."   [Ibid, pp. 830 and 831.]

"The presumption of good faith on the part of the election officers may be rebutted, and when it is shown that they are parties to fraud, the value of the returns as evidence is destroyed; and the fact that a much larger number of votes is returned than the poll book shows to have been cast, will be a circumstance tending to prove fraud.   Where the number is large and the fact is unexplained, it will be conclusive. . . . . Where fraud is proved, it will be presumed to be for the benefit of the party having a majority in such district, especially if the officers of election are of the party in whose favor such a majority is returned."   [Ibid, pp. 832 and 833.]

These general principles, so clearly stated by the authority quoted from, are, as is generally the case, not only fully supported by the cases cited in the notes to the text, but are also found announced in the following cases:   Hendee v. Haden, 60 N. W. Rep. 1034; Furguson v. Henry, 95 Iowa 439; Tebbe v. Smith, 108 Cal. l. c. 107.

In the case last cited the Supreme Court of California tersely and aptly said:

"The principles of law and the rules of evidence governing cases such as this, have been so often declared that a review of the many authorities is unnecessary.   Those curious or interested in pursuing the subject will find in the

reporter's notes, preceding, many instructive cases collated by the industry of counsel. Suffice it here to say, that while the ballots are the best evidence of the manner in which the electors have voted, being silent witnesses which can neither err nor lie, they are the best evidence only when their integrity can be satisfactorily established. One who relies, therefore, upon overcoming the prima facie correctness of the official canvass by a resort to the ballots must first show that the ballots, as presented to the court, are intact and genuine. Where a mode of preservation is enjoined by the statute, proof must be made of a substantial compliance with the requirements of that mode. But such requirements are construed as directory merely, the object looked to being the preservation inviolate of the ballots. If this is established it would be manifestly unjust to reject them merely because the precise mode of reaching it had not been followed.

"So, too, when a substantial compliance with the provisions of the statute has been shown, the burden of proof shifts to the contestee of establishing that, notwithstanding this compliance, the ballots have in fact been tampered with, or that they have been exposed under such circumstances that a violation of them might have taken place. But this proof is not made by a naked showing that it was possible for one to have molested them. The law can not guard against a mere possibility, and no judgment of any of its courts is ever rendered upon one.

"When all this has been said it remains to be added that the question is one of fact, to be determined, in the first instance, by the jury or trial judge; and, while the ballots should be admitted only after clear and satisfactory evidence of their integrity, yet, when they have been admitted, this court will not disturb the ruling, unless we in turn are as well satisfied that the evidence does not warrant it."

Judge McCRARY, in his valuable work on American Law of Elections (2 Ed.), sec. 277, in treating of cases where the ballots will or will not overcome the returns, says:

"Where, as is the case in several of the States, the statute provides a mode of preserving the identical ballots cast at an election, for the purpose of being used as evidence in case of contest, such statute, and particularly those provisions which provide for the safe keeping of such ballots, must be followed with great care. The danger that after the count is made known (especially if the vote is very close) the ballots may be tampered with, is so great, that no opportunity for such tampering can be permitted. Such ballots, in order to be received in evidence, must have remained in the custody of the proper officers of the law, from the time of the original official count, until they are produced before the proper court or officer, and if it appear that they have been handled by unauthorized persons, or that they have been left in an exposed and improper place, they can not be offered to overcome the official count. [See Gooding v. Wilson, 42nd Congress; Butler v. Lehman, 1 Bartlett, 354; Kline v. Verree, Ibid., page 381.] In Butler v. Lehman the House of Representatives, after a full discussion, sustained the minority of the committee in rejecting a recount, upon the ground that the ballot boxes had not been so kept as to rebut a reasonable presumption that they had been tampered with. Upon this subject see Hudson v. Salmon, 19 Kan. 177."

In the case at bar the official returns gave the contestee a majority of ten votes. The second recount gave him a majority of ninety-one votes. The contestee introduced evidence tending to show that the ballots had been faithfully kept and had not been tampered with. But the contestant called thirty witnesses, whose testimony stands uncontradicted and the witnesses unimpeached, who swore that when they

cast their ballots they contained the name of the contestant for clerk of the county court, but when their ballots were examined on the recount the name of contestant was scratched out and no other name inserted for that office. These witnesses were from different precincts in the county.

It is therefore incomprehensible and incredible that their ballots were scratched by the election judges and clerks. They must have been altered after they left the hands of the election officers. This evidence stands uncontradicted. As against it there is the testimony introduced by the contestee that he faithfully guarded the ballots after they came into his possession and that they were not tampered with, but all of them remained sealed in the sacks and the sacks nailed up in the boxes, except as to those from Edith precinct, and as pointed out the recount showed no change as to them. On the one side, therefore, is the direct testimony of the thirty persons who cast the ballots, supported by the official returns of the judges and clerks of election, showing that the ballots had been changed, and on the other is the testimony of the contestee and his deputies who had charge of the ballots after the election to the effect that they had not been changed. The change was in the interest of the contestee. The recount showed no change beneficial to the contestant except one vote in Jasper township. The minds of fair-minded men can not reasonably differ upon such testimony. But if a doubt can be said to still hover around the case as to when the change was made, the presumption of law turns the scales, for the fraud being proved, the law presumes it "to be for the benefit of the party having the majority in such district, especially if the officers of election are of a party in whose favor such a majority is returned." [10 Am. and Eng. Ency. of Law, p. 833.] Here the officer in whose favor the change enures was himself in the legal charge of the ballots

and was the party directly concerned in the result of the
election.

The fact thus appears unanswerably that the ballots
were tampered with after the ballots left the hands of the
judges and clerks of election.    There is no evidence showing
that the contestee did it himself or knowingly permitted it
to be done.    But it was done.    Ordinarily this court will
not weigh conflicting evidence in actions at law, nor interfere
with a finding of fact by a jury or the trial court, if there is
any substantial evidence to support the finding.    In this
case, however, to permit this rule of practice to stand in the
way of discovering and denouncing a fraud upon the elective
franchise would be a mockery of justice.    That the ballots
were changed is not contradicted.    It matters not, then, who
changed them, or when they were changed.    As they now
are, they are not true exponents of the will of the voters.
Their authenticity, integrity and probative force are gone.
They can not overcome the prima facie facts shown on the
face of the returns made by the judges and clerks of elec-
tion.    Those returns showed a majority of ten for contestee.
The ballots, after being tampered with, showed a majority
for contestee of ninety-one votes.    The recount showed that
the judges and clerks had made a mistake of one vote against
contestant.    The ballots on the recount showed, conceding
they had not been tampered with, that the judges and clerks
had made a mistake of eighty-two votes against the con-
testee.    There were 2422 votes returned by the judges and
clerks as having been voted, that is, for contestant, 1179, for
contestee, 1189, not voting for the office, 54.    The recount
reduced the votes for contestant from 1179 to 1120, a differ-
ence of 59, and increased the vote for contestee from 1189 to
1211, a difference of 22, and also increased the number of
persons who did not vote from 54 to 91, a difference of 37.

The recount showed 60 ballots on which contestant's name had been scratched and no name inserted in its stead, and 22 ballots on which contestant's name had been scratched and contestee's name had been inserted in its stead. This aggregates a change of 82 votes in favor of contestee. The recount showed a gain of one vote for contestant. Deducting this one vote from the 82 leaves a net gain of 81 votes for contestee, and this is the exact difference between the ten majority for the contestee shown by the returns of the judges and clerks of election and the ninety-one majority shown by the recount in his favor. It is simply incredible that the judges and clerks of election could have counted sixty ballots for contestant on which his name had been scratched and no other name inserted in its stead, and equally incredible that they could have counted twenty-two ballots for the contestant when those ballots showed that the contestant's name had been scratched and that of the contestee inserted. Eighty-two errors against the contestee out of a total of 1211 votes as the recount showed for contestee, or out of 1189 votes as the judges' returns showed for contestee, is too great a percentage to warrant the reasonable belief that the judges and clerks ignorantly discharged their duty by making 82 errors against contestee and only one against contestant. Or otherwise stated, the judges only made one mistake in counting contestant's votes, but made 82 mistakes in counting contestee's votes. Comment would weaken the absurdity of such a showing.

The trial court therefore erred in finding that the ballots were not tampered with and changed by some one, it is immaterial who did it, after they left the hands of the judges and clerks of election.

This leaves the case in this shape. The ballots can not be looked to. The official returns gave the contestee a major-

Windes v. Nelson.

ity of ten. This is prima facie correct. The contestant challenged the validity of 118 votes cast for the contestee, and the contestee challenged the validity of 131 votes cast for contestant. Of these the court sustained the contestant's challenges as to 21 votes cast for contestee, and sustained the contestee's challenges as to 17 votes cast for contestant. The difference is four votes. Deduct these four votes from the ten majority returned for contestee by the judges and clerks, and it leaves the contestee with a majority of six votes. Both sides seem to have submitted to the finding of the trial court in this regard, the contestee by not excepting, filing a motion for new trial or appealing, and the contestant by not making it a ground in the motion for new trial, and by not even mentioning it in this court. This is decisive of this case in favor of the contestee, unless the contention of the contestant and the ruling of the trial court is correct, that the fraud shown in tampering with the ballots must result in throwing out every vote in the county that was cast for the contestee, or at any rate, every vote cast in Adair and Osage townships for the contestee. This is the only ground urged by contestant in this court for a reversal and judg- in his favor.

Analytically stated this contention amounts to this: Eighty-two votes out of 1211 are shown by the recount to have been fraudulent, the whole 1211 votes must be thrown out, or because the fraud of some one has disfranchised or frustrated the will of eighty-two voters, the court must disfranchise or frustrate the will of the other eleven hundred and nine voters who voted for the contestee and whose votes are not successfully challenged.

Such a ruling by the court would be without any precedent in the law to which our attention has been directed or which we are aware of. The rules of law hereinbefore set

Windes v. Nelson.

out are that if the ballots have been impeached and have lost their integrity, they can not be allowed to overthrow the prima facie facts shown upon the face of the returns of the judges and clerks. Fraud vitiates everything it affects. If the fraud affects the whole transaction it renders it wholly void, but if it affects only a part of a transaction it vitiates only that part. Here there is no fraud shown which affects the whole election or all the votes cast for the contestee. The fraud shown affects only the 82 votes gained by contestee on the recount. The returns of the judges are not shown to be tainted with fraud. They show a majority of ten for the contestee. The finding of the court as to individual votes reduced this majority in favor of the contestee to six votes, and there is no fraud shown or evidence adduced which even tends to wipe out that majority of six.

The contention of contestant that the whole vote for the contestee must be thrown out, which is the whole case made by the contestant before this court, is untenable. The result is that the circuit court erred in finding the fact to be that the ballots had not been tampered with, but it also erred in giving the two instructions asked by the contestant and herein set out, declaring that a partial fraud vitiated the whole vote for the contestee.

On the recount the ballots cast were examined and compared with the poll books, and a report made to the court of the result. In this way it was disclosed how every voter in Camden county voted, and the secrecy of the ballot was destroyed. No objection was made to this proceeding by either party and therefore the legality of the proceeding is not open to review in this case. But I can not permit the fact to pass unnoticed. In my judgment there is no law in this State that permits such a practice. The Constitution (sec. 3, art. 8) provides that all elections shall be by ballot,

which necessarily implies secrecy, but adds: "Provided, That in all cases of contested elections the ballots cast may be counted, compared with the list of voters, and examined under such safeguards and regulations as may be prescribed by law." But an examination of the statutes of this State, will show that the legislature has never prescribed any such regulations or safeguards. Those so far prescribed do not go to the extent of allowing the secrecy of the ballot to be thus destroyed. So that while the Constitution has made it possible for the legislature to do so, the legislature has, in my judgment, wisely refused to exercise this power or to destroy that secrecy. Every election of late years, in large cities, has been followed by an election contest, and the conduct of those cases shows that in a very large majority of instances such cases were not begun in good faith to change the result of the election as declared by the election officers, but for the ulterior purpose of ascertaining how the individual voters exercised their franchise, with a purpose to intimidate them thereafter. The wisdom and necessity of a secret ballot is more apparent to-day than it ever was before in the history of the world. The benefits of a secret ballot were recognized even in the days of Rome, for we find that Cicero in his defense of Plaucius said: "The ballot is dear to the people, for it uncovers men's faces and conceals their thoughts. It gives them the opportunity of doing what they like, and of promising all they are asked." Judge COOLEY, in his work on Constitutional Limitations (6 Ed.), p. 762, says: "The system of ballot voting rests upon the idea that every elector is to be entirely at liberty to vote for whom he pleases and with what party he pleases, and that no one is to have the right, or be in position, to question him for it, either then or at any subsequent time. The courts have held that a voter, even in case of a contested election, can not be compelled to

disclose for whom he voted; and for the same reason we think others who may accidentally, or by trick or artifice, have acquired knowledge on the subject should not be allowed to testify to such knowledge, or to give any information in the courts upon the subject. Public policy requires that the veil of secrecy should be impenetrable, unless the voter himself voluntarily determines to lift it; his ballot is absolutely privileged; and to allow evidence of its contents when he has not waived the privilege is to encourage trickery and fraud, and would in effect establish this remarkable anomaly, that, while the law from motives of public policy establishes the secret ballot with a view to conceal the elector's action, it at the same time encourages a system of espionage, by means of which the veil of secrecy may be penetrated and the voter's action disclosed to the public."

Judge McCrary in his work on Elections (4 Ed.), sec. 488, says: "The chief reason for the general adoption of the ballot in this country is, that it affords the voter the means of preserving the secrecy of his vote, thus enabling him to vote independently and freely, without being subject to be overawed, intimidated, or in any manner controlled by others, and protects him from any ill-will or persecution on account of his vote. The secret ballot is justly regarded as an important and valuable safeguard for the protection of the voter, and particularly the humble citizen, against the influence which wealth and station may be supposed to exercise. And it is for this reason that the privacy is held not to be limited to the moment of depositing the ballot, but is sacredly guarded by the law for all time unless the voter himself shall voluntarily divulge it."

The preservation of the secrecy of the ballot is, in my judgment, of more vital necessity to the independence of the voters and to the perpetuity of our system of government,

State ex rel. v. Reed & Sutton.

than the question of who shall fill any office under the government, from the highest down to the lowest. Accordingly I record my individual disapproval of the course permitted, without objection it is true, in this case, of destroying the secrecy of the ballot and disclosing, without their consent, how every elector in Camden county voted.

The judgment of the circuit court, though proceeding on erroneous principles, is for the right party, as the case is presented by this record, and it is therefore affirmed.

All concur. *Robinson, J.,* in the result.